## Commonwealth *v.* A. L. Spencer and Thomas Aubrey, Appellants.

*Criminal law—Conspiracy—Jurisdiction.*

Conspiracy is a matter of inference deducible from the acts of the parties accused, done in pursuance of an apparent criminal purpose, in common between them, and which rarely are confined to one place and if the parties are linked in one community of design and of interest there can be no good reason why both may not be tried where any distinct overt act is committed; for he who procures another to commit a misdemeanor is guilty of the fact, in whatever place it is committed by the procuree.

*Conspiracy—Evidence of general motives.*

In order properly to comprehend the nature and circumstances of a particular conspiracy, charged in an indictment, evidence as to the motives and conduct of the alleged conspirators in promoting a conspiracy of the same kind to defraud the public generally, is properly admissible.

*Practice, Superior Court—Evidence admitted without objection.*

Where evidence is offered and admitted without objection in the court below it is improper to assign such admission for error.

*Practice, Superior Court—Defective assignment of error.*

An assignment of error as to admission of evidence is defective under Rule 17 which neither quotes the full substance of the bill of exceptions nor copies the bill in immediate connection with the assignment.

*Practice, Superior Court—Review—Refusal to grant new trial—Lack of exceptions.*

Errors to the refusal of the court below to grant a new trial will not be considered when no exception was taken to this action of the court.

A new trial is properly refused where on the motion therefor the evidence adduced upon the trial is not shown to be incorrect in any material matter by anything subsequently made to appear.

Argued Oct. 11, 1897. Appeal, No. 23, Jan. T., 1898, by defendants, from judgment of Q. S. Luzerne Co., Nov. Sess., 1896, No. 39, on verdict of guilty. Before RICE, P. J., WICKHAM, BEAVER, REEDER, ORLADY, SMITH and PORTER, JJ. Affirmed.

Indictment for conspiracy.  Before BENNETT, J.

It appears from the record that the indictment charged the defendants, Spencer and Aubrey, with having conspired wilfully and maliciously to cheat the firm of Koons & Company out of certain spikes, pipes, etc.

The facts sufficiently appear in the opinion of the court.

Verdict of guilty and sentence thereon that each defendant pay $100, costs of prosecution and be imprisoned in the Luzerne county jail for one year.  Defendants appealed.

*Errors assigned* were (1) In admitting under objection evidence offered by the commonwealth as follows : "Commonwealth proposes to prove by the witness on the stand, both by oral conversations and by letters to be subsequently offered, that he entered into an arrangement with the defendants, in the early part of 1896 and latter part of 1895, to organize a corporation under the laws of the state of New Jersey to be known as the Phœnix Contract Company, with power to buy and sell materials, buy and sell stock, bonds and other paper ; with power to construct railroads, bridges, docks, etc., with a paid up capital of $1,000 and an authorized capital of $100,000.  That after procuring said charter they would obtain a rating from a commercial agency which would give them credit in the business world, and that one office of the company should be in the city of New York, and another in the city of Scranton, Lackawanna county, Pa. ; the latter to be the main office.  Thomas Aubrey, one of the defendants, the confidential clerk and employee of A. L. Spencer, the other defendant, was to be the secretary and treasurer of the company.  That they would then proceed to buy materials, such as nails, pipe and the like in large quantities, wherever credit could be obtained on the faith of the incorporation and rating aforesaid."  (2) In admitting under objection certificate of organization of the Phœnix Contract Company issued by the state of New Jersey to be followed by evidence that there was not a dollar paid in to commence business with, the charter stating that the total amount of capitol stock of said company is $100,000, number of shares one thousand, to be followed by evidence that no moneys of this amount of $100,000 was ever paid in.  Defendants' counsel object to this certificate, first, because it appears that the incorporators

were persons other than the defendants and that neither of the defendants is in any way referred to or mentioned in the certificate. (3) In charging the jury as follows: "Indeed it may be necessary and proper to prove a conspiracy of such general character in order to establish the particular conspiracy charged in the indictment, as the offspring of the more general one. But, as we have also in a general way hitherto instructed you, if, as the offspring or succession of such a general conspiracy, these defendants entered into a distinct conspiracy to cheat and defraud Koons & Co., according to the second position taken by the commonwealth, then they may be convicted under this indictment, if overt acts have been committed in this county by either of them or their innocent agent, as claimed by the commonwealth. Again, it is argued in behalf of the defendants that the evidence on the part of the commonwealth which may tend to show the original or general conspiracy claimed by it, is irrelevant and immaterial on the real issue which you are trying, and that it should be disregarded by you in determining whether there was a conspiracy to cheat and defraud Koons & Co. In answer to this we say to you that while such evidence of the general conspiracy claimed is not sufficient to establish the special one in issue, even though it should prove the existence of the former to your satisfaction; yet, that such evidence is nevertheless proper for your consideration as bearing upon the relations existing between the defendants and Milair, through this Phœnix Contract Company, upon the nature and character of the business methods they were pursuing, their purposes and motives at the time, and such evidence may be considered by you in connection with the testimony showing the transactions which led to the opening and conduct of business with Koons & Co., and as bearing upon the question whether there was an independent conspiracy upon the same general plan of execution as the original, yet having for its specific purpose the cheating and defrauding of Koons & Co. The defendant Spencer held no official relation to the company, yet was to act with the other parties in its behalf. These and his testimony, and in fact all of the evidence bearing on the subject of the purposes of this Phœnix Contract Company, are for you, and you are to determine what is the truth in this matter." (4) The entire charge of the court to the jury was prejudicial, misleading and unfair to de-

fendants, charged as they were with a crime.    The court committed error in admitting as evidence upon the trial under the indictment, the following letter, together with a very large number of others of a like character, to be found in commonwealth's exhibits in appendix.    Many of them having been written long before the defendants, or either of them, ever knew George W. Koons & Co., or heard of the Phœnix Contract Co., and even before the inception of said company, and having no reference or relation to either of them.

"Scranton, Pa., Nov. 18, 1895.

" G. A. J. Milair, Esq.

" Room 472, 32 Liberty St., New York.

" Dear Sir: I know now where I can get $20,000 worth of materials for good paper if you can get it here at once.    Can't some Boston firm help you out?    Wire me, as I must let them know.    Here is a rare chance.    Hope to see you Tuesday at farthest.

" Yours truly,

    (Signed)                             " A. L. Spencer."

(5, 6) Refusing a new trial.    (7) In continuing to take jurisdiction of the case after the close of the evidence upon the trial. (8) The refusal of a new trial was an abuse of the discretionary power of the court.

*E. H. Shurtleff* and *I. H. Burns,* for appellants.—The accused defendants cannot be convicted of one offense by evidence of a former offense which had been completed before the inception of the second and which is not charged in the indictment: Hartmann v. Com., 5 Pa. 60; Com. v. Harley, 48 Mass. 506; Com. v. Judd, 2 Mass. 329; Com. v. Kellogg, 61 Mass. 473; Rex v. Roberts, 1 Camp. 399.

So far as our research has extended we do not find that the precise point has been raised in this state, but in Collins v. Com., 3 S. & R. 220, the indictment was drawn in the precise form suggested in the Harley case and is at least persuasive evidence that our courts consider it correct.    The court erred in refusing a new trial.

In at least one case the Supreme Court has examined the trial evidence in order to determine the question of a retrial : Pilger v. Com., 112 Pa. 220.

Whatever may have been said in some of the older decisions in regard to granting new trials by appellate courts we take it that it is now the settled law that a refusal to set aside a verdict in the court below may be alleged for error : Smith v. Times Pub. Co., 178 Pa. 481.

It is confidently asserted that there is no proper and legal evidence to prove the charge as laid in the indictment or to sustain the jurisdiction of the court of Luzerne county. Not only this, but the great change in the facts, as they would be presented on another trial, is amply sufficient to justify this court in granting us a rehearing.

*John T. Lenahan* and *Henry A. Fuller*, with them *Daniel A. Fell*, district attorney, for appellee.—Authorities are legion establishing the competency of distinct but connected offenses to prove guilty knowledge or criminal intent, some of which are considered by the court below, and others may be cited here : Kramer v. Com., 87 Pa. 299 ; Goersen v. Com., 99 Pa. 388 ; s. c. 106 Pa. 477 ; Com. v. Johnson, 133 Pa. 293 ; Com. v. Place, 153 Pa. 314.

The court below have found that :

"The evidence adduced upon the trial has not been shown to be incorrect in any material matter by anything subsequently made to appear. Nor do the manner and circumstances under which at a very late period after the verdict the so-called correction or retraction came about, serve to impress us with its importance or merit as a reason for a new trial."

Jurisdiction in conspiracy is obtained by any overt acts done within the jurisdiction.

OPINION BY WICKHAM, J., January 18, 1898 :

The defendants in this case were indicted and convicted for conspiring to cheat and defraud George W. Koons & Co. of valuable personal property. The evidence consisting of about four hundred and fifty-three pages of printed testimony, and one hundred and twenty letters and other documentary exhibits, reveals the philosophy and methods of one of the dangerous forms of dishonesty peculiar to modern business life.

A. L. Spencer, living in Scranton, Pa., had been engaged, prior to 1895, in business dealings with one E. T. Day, of New

York City, and as he alleges, obtained through Day, as security for some indebtedness owing to him from the latter, certain notes issued by a corporation called the Southwestern Pacific Company. This was a speculative, insolvent concern of shadowy outline, whereof G. A. J. Milair, also of New York, was president. How long it eked out an existence we do not know, but it is quite sure that it was defunct for some time before the Phœnix Contract Company was formed. Just what the precise nature of the relations between Spencer and Milair were before October of the year 1895, is hard to tell; their testimony in regard to this matter is not as clear as it might be, and much is left for surmise, but from their letters appearing in evidence, it seems that they were on terms of close business intimacy, that Milair was procuring and trying to procure iron, lumber, and other materials for Spencer, to reduce Day's indebtedness to the latter and probably to help himself at the same time. For these purposes the Southwestern Pacific Company was used to some extent, and if Milair is to be believed, would have been fraudulently employed in an extensive way, at Spencer's suggestion, had not its credit utterly failed. When things had reached this pass, and it became evident to Spencer that the old company could no longer be made available for either honest or dishonest uses, we find him writing to Milair, under date of October 8, 1895, complaining that the latter had not sent lumber, iron and spikes as he had promised, and suggesting as follows : " I tell you the thing to do is to start a new Co. The old one, no matter what you may do, is hammered out of existence and is carrying a bigger black eye than you will ever be able to heal. If you will pitch in, I will turn material into cash for you. I would like to handle the money end of it myself. What do you say ? "

Before this letter was written, Spencer, Day and Milair had at least one conference in New York about organizing the new company, the real purpose whereof, as Milair, in effect admits, being to buy materials, to wit: iron, nails, spikes, lumber, etc., sell the same and divide the proceeds, Spencer to receive fifty per centum thereof. Whether he was to get more in the aggregate than would pay his debt, then alleged to be $8,500, is not quite clear, nor is it very material. The other fifty per cent was to go to the New York end of the concern. Aubrey was to get

$1,500 a year for his services, seemingly to be paid out of the gross receipts.

On October 14, 1895, Spencer again writes Milair, saying: "Viewing your situation in the back ground and from past experience, I realize fully how difficult it is to buy with the credit of S. W. P. Co., and each report through the agencies reflects stronger and stronger on you and that Co.; hence the necessity of forming a new one under a wholly new name that you can sit quietly back and manage. We are all discouraged at this end." On October 22, 1895, he writes Milair concerning a note, and says: "Your name and that of the S. W. P. Co. must not appear." In a letter to Milair, dated December 2, 1895, he suggests that the title of the new company, the formation of which was then under consideration, shall be "New York Construction & Fire Proofing Co." and adds, "As I am to use the material or dispose of it, it would seem that I should be out of the list. . . . . Get up the new company under this head, and Aubrey as secretary or treasurer as you wish. Will look for your letter and small notes to-morrow. I am worried as the time to take care of the old ones is short. Do not forget that now is the time I need your aid." Aubrey was Spencer's bookkeeper and business confidant.

Milair, recognizing the fitness of things, preferred the name, "The Phœnix Contract Company," and so wrote Spencer, and the latter name was chosen. When asked by the defendants' counsel: "I suppose you suggested that because it was rising out of the ashes of your former enterprise?" He replied, "That was my idea, yes; that is the reason I thought it was an appropriate name."

In a letter to Milair, dated December 13, 1895, Spencer states: "My attorney says I cannot be a director in any company without being liable for its debts, and I can't afford to do that." On December 28, he says in another letter: "A new company with Pelletreau and Hoffmire and several others with us, would make the thing go at once. This is the quickest way to get easy, and if they would authorize Aubrey to buy, we could begin now," etc. It may be remarked here, that throughout the voluminous correspondence, only brief extracts from which can be presented, Spencer appears anxious to get every one, that

might be made useful, into the new company, while determined to have no visible connection with it himself.

In a letter of January 15, 1896, he complains to Milair that the latter is "too slow about the new company" and concludes as follows: "You cannot afford to neglect this new company for something less reliable. When you get H. and P. to join, I will send $25.00 for charter. Now act quickly. Aubrey has become discouraged at your slow pace." The next letter, dated February 8, 1896, and referring to certain notes that he wanted Milair to send him for speculative purposes, contains the following: "It would be as well that the notes should bear no indorsement that would suggest the South Western Pacific Company. This deal has progressed so satisfactorily so far that I would not on any account have it imperiled now." Two days later, he writes Milair: "Both myself and Aubrey are ready to take off our coats to make the new company a success, if we can only get it started, and I accordingly enclose a check as promised, payable to the secretary of state of New Jersey, amount $26.00, and shall be glad to know that the organization will be completed at an early date." It seems that Milair did not have the small sum of money needed to pay the fees on the issuing of the charter. On February 26, Spencer says in another letter to Milair: "I wired you this morning to send me the name of the new company, and the position assigned to Aubrey in it, as I want to work some of the matters I have on hand through the medium of the new organization." The telegram referred to is, as follows: "Wire name new company, Aubrey's position in it so can make purchases." In a letter, dated March 2, 1896, he says: "I want Thomas Aubrey made secretary and treasurer of the Phœnix Contract Co., as he will do the buying and trading at this end." On March 7, 1896, he writes: "I hope you will now lay aside every other scheme until this is perfected, and once in working order, I am sure it will be highly renumerative for you and me." The charter for the Phœnix Contract Company was obtained under the laws of New Jersey, on March 7, 1896, and the capital stock was fixed at $100,000. Milair, Joseph P. Wiswall, and Charles R. Braine were the incorporators, all so far as we can see, being financially irresponsible, nor does it appear that James Kennedy, who was brought in later, concededly as a figure head, was in much better condition. The $26.00 check.

was used in paying for the charter. Braine was made president, Kennedy vice-president, Aubrey secretary and treasurer with an office at Scranton, and Milair general manager, with an office in New York. Braine, as Milair says in his testimony, was the " Mr. B." referred to in the following extract from Spencer's letter to Milair dated October 14, 1895, " We are all discouraged at this end. Mr. B. has given up the idea of getting spruce lumber. I fear we shall not be able to bring him into use again." On March 17, 1896, Spencer says in a communication to Milair : " I enclose herewith check, $50.00, to cover rent of new offices at 156 Broadway, and hope to hear at once that you have closed arrangements for same. This must be done at once that we may proceed to get our stationery printed here and that you may arrange for a rating as suggested to Aubrey yesterday. Please lose no time in these matters. I am specially anxious if possible to get some money this month to take up some of the old papers, and I see no other way to accomplish it but through the medium of the new Co. Nothing can be done until these details are definitely fixed, and we must all act at once while trade remains dull." On the next day, he again writes, saying " I cannot too greatly emphasize the necessity for promptly obtaining for the new Co. a good rating. Nothing can be done without it, and if it is delayed we can do no business here." Again on March 24th, he says : " I am very anxious on the question of rating for the new Co., of which you make no mention in recent letters. Please rush this matter as Aubrey and I are very desirous of getting down to business. Material is daily offered to me, which the Phœnix Co. could easily buy, given a good rating. We cannot make a move without it however, and I don't want to run the risk of making a mistake." Three days later, he writes Milair : " Now we have lots of business in the air. The delay on the rating hurts. The secretary sent out specifications (at a risk I think) for $22,000 worth of nails. . . . If you can get in new office do so at once, as inquiries may come there concerning the nails purchased."

Before this time Aubrey had also been writing Milair hurrying him up. In a letter under date of March 21, 1896, he says : " We are all in shape here to proceed to business, but awaiting your advice as to rating. Please say when you can secure this, as it will certainly be the first question put to us in response to

inquiries for material. . . . It will be advisable for each of us to keep the other informed of every move made, so that there may be no surprises sprung on either." On the 26th of the same month, he writes: "Seeing that Mr. S. will ultimately handle a large proportion of the material we shall buy, it will be inadvisable to use his name as reference whenever it is asked for." On the 30th of the same month, he again writes Milair, saying: "Mr. Spencer wired you this A. M. to be here on Wednesday morning without fail. We have agreed to meet Dun's agent at 3 o'clock on Wednesday afternoon to make a statement relative to the position of this Co. This must be done at once inasmuch as we have a big nail deal practically consummated, and if we can only nobble Dun's local man, we are safe to carry it through. Please do not fail to be here and bring along whatever you can that will establish us with Dun's. A rating can be more easily procured here than in N. Y. From what Mr. Spencer said in his letter to you on Friday, I concluded you would be on the lookout for nail men. I wrote to every nail mill in Penna., and have one quotation today that looks like positive business. Hence the necessity for your certain appearance on Wednesday. Anything in the shape of bonds, notes, or securities of any kind that you can get hold of, it would be very essential to bring along with you."

It is significant that the "big nail deal" referred to was the one consummated with Koons later, as Aubrey admits in his cross-examination. This matter has a most important bearing on the alleged particular conspiracy of Spencer and Aubrey to defraud Koons. Among the definitions of "nobble" a word little used here, but common in England, Aubrey's native country, the Century Dictionary gives the following, "Circumvent," "get the better of," "get hold of dishonestly," and a nobbler is "a thimblerigger's confederate."

In response to the call from Spencer and Aubrey, Milair went from New York to Scranton, and met them at the company's office in the latter city. The three men, in order to get a good business rating through R. G. Dun & Co.'s agency, for the Phœnix Contract Company, prepared the following statement:

"The authorized capital stock of the Company is $100,000, of which $50,000 has been subscribed and paid for. The assets of the company is:

| | |
|---|---:|
| Cash in bank . . . . . . | $ 3,000.00 |
| Bills receivable . . . . . . | 10,000.00 |
| Merchandise, about . . . . . | 17,000.00 |
| Stocks, Bonds, etc. . . . . . | 20,000.00 |
| Total . . . . . . . | $50,000.00 |
| Liabilities . . . . . . . | None. |

" The banking of the company is done with the Traders' National Bank, Scranton, Pa.

" The business of the company is that of general contractors for the construction of railroads, bridges, etc. etc., and has several large contracts pending."

Not a dollar of the stock was at any time paid for, nor was it intended that it should be paid for, even in part. In what proportions it was held by the incorporators does not appear. Indeed, Aubrey, the secretary and treasurer, admits in his testimony that he did not know himself. But this was a matter of small moment, seeing that the division of the gross receipts in the manner agreed on, rather than of legitimate profits, was the chief aim and object of the confederacy. The company was organized mainly to get goods on credit, or for securities of little or no value, that Milair might pick up in New York and elsewhere by the questionable methods revealed by the evidence. That there was no intention to expend more money than was absolutely necessary to bait the traps from time to time is very apparent. The company had nothing in the way of assets or capital save $3,000 temporarily deposited by Spencer in the Traders' National Bank of Scranton to aid in making a false show and securing a fraudulent rating. This deposit, as is shown by the correspondence, had " a string to it," and was all withdrawn inside of thirty days. A statement more boldly and nakedly false was, perhaps, never before sought to be imposed on a mercantile agency.

It failed to accomplish its intended purpose with R. G. Dun & Co., but misled Bradstreet's agency, which latter concern gave the company the desired rating. Everything was now ready for the " big nail deal " with Koons, who lived in Audenreid, a town on the edge of Luzerne county, and was representing himself and his partner George John. To bring about this deal speedily was evidently the main reason for the anxiety of Spen-

cer and Aubrey to get Milair to Scranton and secure a rating, as the evidence shows that on the very day Aubrey wrote his letter last quoted from, he had negotiated with Koons for a large lot of nails. Thereafter the two Scranton conspirators followed Koons as the skillful hunter pursues his quarry. Aubrey's letters to his victim, wherein he assumes the tone of a strict and careful business man, who will not stand any remissness, his complaints of delay, his intimations that only the greatest promptness on the part of Koons will save the latter from losing a valuable customer, are models of cunning and effrontery.

By June 10, 1895, goods to the value of $10,050.27 had been obtained from Koons and his partner. They were secured through about a dozen shipments, all save two made to points in Luzerne county. Of the total price, $1,000 was paid in cash and about $950 by turning over to Koons storage receipts for some goods in New York, the title to which he testified at the trial, was still in dispute. Beyond these amounts nothing was paid. On June 8, 1896, when only $15.00 stood to the credit of the company in the bank wherewith all its business was done, the other moneys collected from the sales of Koons's goods having been divided between Spencer and Aubrey, the latter negotiated with Koons for material to cost $12,000 more. In a letter of that date to Milair he says: "It was the best policy to give Koons money, as I have now got his entire confidence, and yesterday closed a deal with him for $12,000 worth of material for prompt delivery." Before Koons shipped the goods last ordered, he suspected that he was being cheated and refused to go any farther. In an earlier letter written May 23, 1896, to Milair, Aubrey says, speaking of Koons, " I think you had better leave him to me, and if you reply to his letter give him to understand that you will not interfere between the Scranton office and his good self, inasmuch as his treatment of our orders has been so unbusinesslike and annoying to us. We can work him well enough from this end, and his zeal for prompt cash settlements will soon cool off. . . . Mr. Spencer has written a good letter to Lehigh Lumber Co." Spencer's letter to the Lehigh Lumber Company was one recommending the Phœnix Contract Company·as entitled to credit, and falsely representing its business and assets.

What became of the material purchased from Koons ? This inquiry is fully answered by the evidence. No sooner were shipments commenced than a manufacturer's agent, or broker, Fred E. Turner, of Wilkes-Barre, a debtor of Spencer, was sent for and an arrangement made with him to sell the property. Spencer, Aubrey and Turner met, not at the office of the Phœnix Contract Company, but at Spencer's own office at Green Ridge Iron Works, Scranton. Turner says, " They there informed me that the Phœnix Contract Company had been organized, and that they had excess material that would be turned into cash, at a price below the market rate, in order to assist Mr. Spencer on some notes that he had indorsed for gentlemen in New York." They farther explained that the excess was from a large contract that the company had in the west, and that Spencer had put Aubrey into the company as secretary and treasurer, to look after Spencer's interests. Turner immediately started for New York, to which city the first shipments had been made, where he sold one thousand kegs of nails at ten per cent below the then market rate, and the price agreed to be paid Koons only a few days before, his commissions, part of which were to be applied to his indebtedness to Spencer, to come out of the sums realized.

After the material in New York had been disposed of, he went into Luzerne county, pursuant to his authority, and from time to time, during the spring and summer of 1896, there sold the goods shipped by Koons into that county, at figures (sometimes as much as fifteen per cent) below the ruling market prices. Most, perhaps all, of these goods were consigned by G. W. Koons & Co. to themselves, at Wilkes-Barre and Plymouth. The facts just recited are important in considering what overt acts were committed in Luzerne county by Spencer and Aubrey, or either of them, acting by authority express or implied of both, or by their agent Turner, in furtherance of the common design. The offenders may be indicted in any county where even a single overt act has been committed. Our Supreme Court, announcing the general rule on the subject, has said in Commonwealth v. Gillespie, 7 S. & R. 469, and the language is applicable to more than one branch of this case: " It must be recollected that conspiracy is a matter of inference, deducible from the acts of the parties accused, done in pursu-

ance of an apparent criminal purpose, in common between them, and which rarely are confined to one place, and if the parties are linked in one community of design and of interest, there can be no good reason why both may not be tried where one distinct overt act is committed, for he who procures another to commit a misdemeanor is guilty of the fact, in whatever place it is committed by the procuree."

Turner usually made the Luzerne county sales while the goods were yet in the carriers' hands, consigned to G. W. Koons & Co., and therefore liable to stoppage in transitu: Hayes & Black v. Mouille & Co., 14 Pa. 48; Penna. R. Co. v. Amer. Oil Works, 126 Pa. 485; Tiffany on Sales, 216–217. In such cases he reported the sales to the Scranton office, and orders of G. W. Koons & Co. to deliver were sent from there to the carriers. Sometimes he had deliveries made directly to himself. It cannot be denied that these transactions constituted overt acts, in furtherance of the scheme to defraud. It is urged, however, for the defense, that while Spencer may have been in the conspiracy to defraud the public generally, there is no sufficient proof that he conspired against G. W. Koons & Co., or that he authorized any overt act in Luzerne county, and that therefore the defendant could not be brought within the jurisdiction of the court of quarter sessions of that county. But Turner testifies that he talked and communicated with both defendants regarding the business, that "he," Spencer, "advised with me on the sale of material that was under way. If I needed any instructions or advice I got it from either one of them, from either Mr. Spencer or Mr. Aubrey." It must be remembered that practically the only victim, or at least the only one worth mentioning that came into the net, was Koons, and that about the only business done, so far as the evidence shows, was getting hold of the goods of Koons and his partner, promptly selling them at less than cost and market prices, and dividing the proceeds between Spencer and Aubrey, the former getting most of the money. Everything that was realized went substantially to these two men. Their confederates were completely ignored in the division of the spoils. Milair testifies, and his testimony in the main is borne out by other evidence, " They got in I understand some eight or ten thousand dollars. They told me all the time they had not

received it, but it seems they did receive it during June, July, and August. They told me the goods had not been delivered and had not received any money, could not even send money for the rent of the office in New York. In the meantime had taken thousands of dollars as it appears out of the treasury of the company." He also says, and there is no denial, " I asked the secretary and treasurer for a statement repeatedly and repeatedly; never furnished it to me. I don't know how much money was paid in or what paid out, they would not allow me to see the books, or allow me, ———, to give me any information of any kind. They simply took the money and left me in New York."

Koons testifies that after he had made a shipment or two, he met Spencer, at Aubrey's request, and that the former assured him that Aubrey and the Phœnix Contract Company were all right and that " he would not hesitate to give them a line of credit himself." It will be observed, from the evidence, that he did not do this, although the company was anxious to buy the very things he was manufacturing and selling.

On one occasion Aubrey went to Wilkes-Barre, and told Spencer that Turner needed money the next day, and that they must go together and collect some of the bills for the goods sold by Turner. This they did and Aubrey went back to Scranton with the funds. It would be easy to refer to other evidence, in the case, tending still further to show the intimate connection and understanding between Spencer and Aubrey in regard to the transactions with Koons, and that from beginning to end Spencer's was the master mind.

A motion for a new trial was made in the court below, one of the main reasons relied on being an affidavit made by Turner after the trial, that he did not mean to say in his testimony that Spencer had directed him to sell the material furnished by the Koons' firm. This was not in accordance with his story told the counsel for the commonwealth, or his testimony before the grand jury and the traverse jury, which was undenied by the defendants at the trial. His deposition was taken to be used at the argument of the motion, and it appears from it that, a month after the trial, Spencer had Turner go to Scranton, and, after talking to him, secured the affidavit. Unfortunately for the defense, Turner, on cross-examination, was compelled in his deposition

to explain the affidavit, and his explanation when analyzed simply means, to use his own language, that Spencer did not "actually and solely" employ him to make the sales. But even if we accept the affidavit as true, and meaning all that it says, there is still enough left in the circumstances, the unassailed and unretracted part of the testimony of Turner, and the other evidence, to amply justify the conviction. Turner's agreement to receive $500 for furnishing information, which aided Koons in following the conspirators in their secret windings, throws no doubt on those portions of his testimony impliedly admitted to be true, and to which he still adheres.

It is urged by the defense that the commonwealth should not have been permitted to go into the history of the formation and purposes of the Phœnix Contract Company, as by so doing a separate and indictable conspiracy to defraud the public at large was uncovered. For the same reason it might be objected, in behalf of one indicted for killing or wounding another with a deadly weapon, that the commonwealth should be debarred from proving that the prisoner, for weeks before the commission of the crime, had, contrary to our statute, carried the weapon, concealed on his person, with the deliberate intention of using it against any one whom he might select from a class of persons. In order to properly comprehend the nature and circumstances of the particular conspiracy charged in the indictment, and the motives and conduct of the two defendants, it was absolutely necessary to admit the evidence whereof complaint is made. Never in the history of English or American jurisprudence was there a time when an intelligent judge would have excluded it. The bogus company was part of the juggling machinery created by the defendants to delude their victims, and was deliberately, skillfully and successfully employed as a means or instrument in deceiving Koons. Had it not been so used, by both defendants, there would be reason in their objection. The case of Carroll v. Commonwealth, 84 Pa. 107, and kindred authorities fully sustain the admissibility of the evidence, but, even before these cases were decided, its relevancy could not have been fairly questioned.

Coming now to a direct consideration of the assignments of error, we find that the first fails to comply with Rule 17 of this

court, as it neither quotes the full substance of the bill of exceptions, nor copies the bill in immediate connection with the assignment. The offer of evidence and the ruling thereon are given, but the evidence itself is neither set forth nor incorporated by reference. The second assignment, at least so far as it relates to the evidence outside of the certificate therein mentioned, is open to the same objection, and the further one that it fails even to show the ruling of the court on the offer. The letters referred to in the fourth assignment only one of which is set forth or otherwise individuated were, so far as we can see, offered and admitted without objection; hence it is unfair to the court below, as well as improper, to assign their admission as error. The fifth, sixth, and eighth assignments complain of the refusal of the court below to grant a new trial. No exception was taken to this action of the court. The other assignments, relating to the jurisdiction of the court, and alleged errors in the charge, cannot be sustained. The statement quoted from the charge, in the third assignment of error, is fully warranted by Spencer's own undenied and unexplained letters.

The peculiar character of the case has led us, as will be observed, to consider it more fully and broadly on its merits than a strict adherence to our rules, relating to assignments of error, demands. In doing so we have reached the conclusion, that the defendants were treated with the greatest fairness during the trial, every doubtful question raised by their counsel having been resolved in their favor, that the verdict was the only one the evidence would warrant, that a new trial was justly refused for the reasons set forth by the learned trial judge in his opinion, and that the sentences are very merciful.

All the specifications of error are overruled, the judgments are affirmed, and the record remitted to the court below, to the end that the sentences imposed may be duly enforced. And it is ordered that the defendants surrender themselves forthwith to the custody of the keeper of the jail of Luzerne county, and serve out so much of the periods of imprisonment, prescribed by the said sentences, as had not expired on June 30, 1897, the day the supersedeas allowed on this appeal took effect.