Com. of Pa., *v.* Barnes, Appellant.
Com. of Pa., *v.* Sexton, Appellant.

Argued March 14, 1932.

Before TREXLER, P. J., KELLER, GAWTHROP, CUN-
NINGHAM, BALDRIGE, STADTFELD and PARKER, JJ.

*Ernest Frey,* and with him *R. A. Balph* and *James Balph* and *William Coghlan,* for E. A. Ford Barnes, appellant; *Forest G. Moorhead* of *Moorhead and Marshall,* and with him *Edward G. Coll,* for H. Clayton Sexton, appellant, cited: Heine v. Commonwealth, 91 Pa. 145; Commonwealth v. Bingle, 62 Pa. Superior Ct. 105; Commonwealth v. Heil, 8 D. & C. Rep. 797; Commonwealth v. Bixler, 79 Pa. Superior Ct. 295; Commonwealth v. Wilson, 266 Pa. 236.

*Thompson Bradshaw,* and with him *Lawrence M. Sebring* and *A. B. DeCastrique,* District Attorney, for appellee, cited: Fountain v. Bigham, 235 Pa. 35.

OPINION BY STADTFELD, J., October 10, 1932:

These are appeals by the defendants in two separate indictments on a charge of fraudulent conversion in one count, and a charge of malicious conspiracy to cheat and defraud in a second count. At the trial, by agreement of counsel of both sides, the cases were tried together, and the jury found both defendants guilty as indicted. Defendants filed a motion for new trial, and in arrest of judgment. The court, McCONNEL, J., writing the opinion, made an order, directing that so much of the verdict in each case as found the defendant guilty of fraudulent conversion be set aside, and judgment on that count entered in favor of the defendants, and to that extent judgment arrested. The motion for new trial was overruled, and defendants directed to appear for sentence upon the verdict which

found them guilty of conspiracy to defraud. On December 22, 1931, defendants appeared, whereupon further sentence was suspended upon condition that defendants pay the costs, the sum of $500 to the Commonwealth in the nature of a fine, and make restitution to the prosecutors.

The defendants filed separate appeals to this court at Nos. 166 and 167 April Term 1932 from this sentence. The Commonwealth has appealed to this court at Nos. 173 and 174 April Term 1932 from the judgment of the court, setting aside the verdict of guilty of the charge of fraudulent conversion, and entering judgment in favor of the defendants on the first count, and to that extent arresting judgment.

We shall consider first the appeals of the defendants from the sentence on the conviction of conspiracy to defraud. On account of the facts being considerably involved, and the cases having been tried together, we cannot improve upon the statement of the facts as supported by the evidence and stated in the opinion of the lower court, from which we quote in part as follows:

"From the evidence it appears that in February, 1931, Thompson Bradshaw, a member of the bar of this county, was consulted by Vye S. Thompson and Jean Patterson Dawson with regard to some funds and securities belonging to them which they claimed H. Clay Sexton had misappropriated, and Mr. Bradshaw then communicated with Mr. Sexton and arranged to meet him at Bradshaw's office on February 22, 1931. At this meeting, Mr. Sexton was told that Mrs. Thompson and Mrs. Dawson claimed that he had certain securities of theirs and that he had failed to make any accounting to them for the proceeds of these securities, and that an accounting from Mr. Sexton was desired. This resulted in negotiations with Mr. Sexton which extended until April 13, when an information seems to have been made against Mr. Sexton charging him

with fraudulent conversion, and he was arrested and brought before a justice of the peace in Beaver. When he was so arrested he asked to be permitted to talk to Mrs. Thompson and Mrs. Dawson, who had made the informations against him, and at his request he was taken to the home of Mrs. Thompson on Patterson Heights. Mrs. Thompson and Mrs. Dawson refused to talk with Mr. Sexton unless their counsel was present, and Mr. Bradshaw was sent for and in the evening of April 13, 1931, went to the home of Mrs. Thompson where he talked with Mr. Sexton. At that time Mr. Sexton was anxious to have the proceedings against him settled and to make what restitution he could to Mrs. Thompson and Mrs. Dawson. Among other things he told Mr. Bradshaw that he had a fee coming which would be a very substantial one in a case that had been dragging out for a long time, in which he was connected; that it was a federal tax case of the Union Drawn Steel Company in Beaver Falls, and that the legal end of the case was being handled by a firm of lawyers in Washington, D. C., headed by a man named Hamel; that this tax case had just been settled a few days before, and he and Barnes, or Barnes and Company, would be entitled to a very substantial amount; that his share of this fee was one-half and he approximated the amount of the fee at $15,000, and he proposed to turn over his share of this fee to Mrs. Thompson and Mrs. Dawson; and he also proposed to turn over to them certain other securities which he had and to give them a second mortgage upon his home in Beaver. Mr. Bradshaw told him, after he had consulted with his clients, that he would go along with Mr. Sexton on his proposition if he could be satisfied that the fees which Mr. Sexton offered to turn over to Mrs. Thompson and Mrs. Dawson were tangible, or real and not imaginary, and he proposed that they go the next day to Pittsburgh and see E. A. Ford Barnes with regard to this fee, and

also with reference to another fee which Mr. Sexton had not yet earned, but which he would be entitled to if he succeeded in selling the Tyrone Water Works.

"In pursuance of this arrangement, on the morning of April 14, 1931, Mr. Sexton and Mr. Bradshaw, accompanied by C. J. O'Laughlin, the county detective of Beaver County, went to Pittsburgh and went to the office of Barnes and Company. After they reached this office and met E. A. Ford Barnes, Mr. Bradshaw explained to Mr. Barnes the difficulties that Mr. Sexton was in; that Sexton had made him a proposition toward making some reparation to his clients; that Sexton had informed him that he (Sexton) and Barnes had earned a fee in the settlement of a Union Drawn Steel Company federal tax case, and that that fee would be payable through an attorney in Washington, D. C., by the name of Hamel. Thereupon Mr. Barnes stated that there was such a fee, and stated that this Union Drawn Steel tax case had been closed or settled a short time before, and that the fee would be coming through within a week or ten days; that it was to be paid by the Republic Steel Company, which had acquired the Union Drawn Steel Company, to Hamel in Washington; and that Hamel would remit to Barnes, or Barnes and Company, and he stated that the amount of this fee ought to be at least $15,000; that he had not had any official notice or confirmation of the settlement of this claim, but that he had seen it announced in the papers; that there was a certain charge against that fee amounting to $1,500, which would be owing to Homer H. Swaney, at Beaver Falls, for his services in connection with it, and that this amount would first have to be paid out of the fee which they received. Barnes and Sexton said that the amount of the tax claim of the Union Drawn Steel Company involved something like $500,000, and that this proceeding had resulted in a saving to the company of approximately $168,000. While they were talking in Barnes' office,

one of the employees in the office was asked either by Barnes or Sexton, to telephone the office of the Union Drawn Steel Company, and he inquired over the telephone whether the matter had come through yet from the Republic Steel Company, and he said that it had not yet come through. Mr. Barnes said that he would cooperate with Mr. Bradshaw in every way to secure a settlement of Mr. Sexton's affairs; that he would do all he could to get this fee paid at the earliest moment, and that he would turn over to Mr. Bradshaw Sexton's one-half of this fee. After this conversation Mr. Bradshaw and Mr. Sexton went to the office of Mr. Bradshaw in Beaver, and there, among other papers, an assignment was drawn up and signed by Mr. Sexton. This assignment is Exhibit 1 in this case, and is as follows: 'Whereas I am now or presently will be entitled to certain fees for services in connection with a proceedings for a refund of federal tax assessed against the Union Drawn Steel Company, of Beaver Falls, Pennsylvania, which fee is to be first paid to Charles D. Hammill, of Washington, D. C., and

" 'Whereas upon receipt of the same the said Charles D. Hammill is obligated to make payment of said fee to Barnes and Company, of Pittsburgh, Pennsylvania; and

" 'Whereas after said payment and certain deductions for expense in connection therewith I am entitled to fifty per centum thereof.

" 'Now, therefore, know all men by these presents, that I have sold, assigned, transferred and set over, and by these presents do sell, assign, transfer and set over unto May and Bradshaw, of Beaver, Pennsylvania, attorneys for Vye S. Thompson and Jean Patterson Dawson, all my right, title, interest and claim of, in and to said fee or commission, hereby authorizing and empowering Charles D. Hammill of Washington, D. C., to make payment to Barnes and Company of Pittsburgh, Pennsylvania, and the said Barnes and

Company to make payment of my share of said fee to May and Bradshaw forthwith upon receipt thereof, and this shall be their sufficient authority for so doing. This assignment is irrevocable and for a valuable consideration.

" 'In witness whereof I have hereunto set my hand and seal this 14th day of April, A. D. 1931. (Signed) H. Clay Sexton (Seal).

" 'Witness: Daisy Blowers, Thompson Bradshaw.'

"This assignment was delivered, after it had been executed by Mr. Sexton, to Mr. Bradshaw, and on April 16, 1931, Mr. Bradshaw wrote the following letter to Barnes and Company:

" 'Beaver, Pa., April 16, 1931.

" 'Barnes & Company,
Union Bank Building,
Pittsburgh, Pa.

" 'Attention Mr. Barnes

" 'Gentlemen:

" 'Herewith I am enclosing an assignment by H. Clay Sexton to our firm of the fee to which he will be entitled out of the settlement of the Union Drawn Steel Company tax refund case. Will you please advise me promptly when this fee comes through? Payment is to be made directly by your firm to my firm, and if you like this can be arranged in the presence of Mr. Sexton.

Yours truly,
" 'TB/DB          (Signed) Thompson Bradshaw.'

"This letter was received in due course by Mr. Barnes, and was never answered in writing by him to Mr. Bradshaw.

"Barnes and Company was simply E. A. Ford Barnes doing business as Barnes and Company, and H. Clay Sexton was a very intimate friend of Mr. Barnes, and was closely connected with Barnes and Company, so much so that he even signed a check of Barnes and Company as treasurer, and his head-

quarters and place of business was in the office of Barnes and Company, at Pittsburgh. He was an expert accountant, and Barnes was a certified public accountant.

"About a week after April 14, 1931, Mr. Bradshaw called Mr. Barnes over the telephone, and asked him if he had got anywhere yet on the Union Drawn Steel Company fee, and he said they had not; that Hamel was out of town, but that he expected him back pretty soon and when he got back if he did not hear from him that he (Barnes) was going over to Washington and he said he hoped that he would have it for Mr. Bradshaw surely within a week, and that he would let Mr. Bradshaw know the moment he was ready to pay. A few days later Mr. Bradshaw again called Mr. Barnes' office, and he was told that he was going over to Washington during that week-end to see Hamel. The first of the next week Mr. Bradshaw called him again, and he told him that he was having some argument with Hamel about the fee and about the costs which were chargeable against it, and for that reason it had not yet been paid. A few days after that he again telephoned to Barnes' office and talked to Mr. Sexton, and Mr. Sexton told him that Mr. Hamel had been called suddenly to Europe and would be gone for ten days or two weeks, and that they did not settle the matter of the fee with him because they wanted to iron out the matter of certain costs or charges Hamel wanted to put up against the fee. Mr. Bradshaw then waited a week or ten days, and then called the office again, and he kept calling the office every few days until the middle of May, when he was told that Hamel had gone to Europe; then he waited for a week or ten days longer, which would be about the first of June, and when he called then neither Mr. Sexton nor Mr. Barnes were in the office, and he was unable to get them, and from that time on he called their office every day for about ten days, except Sundays, and

left messages and requests for them to telephone him.

"On June 8, 1931, Bradshaw wrote a letter to Mr. Barnes, as follows:

" 'June 8, 1931.

" 'Mr. E. A. Ford Barnes,
   Union Trust Building,
      Pittsburgh, Pa.

" 'Dear sir:

" 'I called your office practically every day for the past two weeks and left word asking that you call me, but so far I have not heard from you. I talked once with Sexton, who stated that the Washington lawyer involved in his matter was suddenly called to Europe, and that no understanding had been reached about the fees prior to his going. As I understand it he has now returned, and I suppose that some arrangement is made about the fee.

" 'Will you please let me know the status of this fee and when we may expect the matter to be closed? It has now been delayed for a considerable length of time, and my clients are getting extremely dissatisfied with the way the Sexton matter is moving.

Yours truly,

" 'TB/DB          (Signed) Thompson Bradshaw.'

"This letter was received by Mr. Barnes, but never replied to. On June 18, 1931, he wrote a letter to Mr. Sexton telling him that it would be for his interest to see Mr. Bradshaw. About two days after that Mr. Sexton went to office of Mr. Bradshaw in Beaver, and Mr. Bradshaw then asked him what was wrong with this Union Drawn Steel Company fee that it had not yet been paid. Sexton said that he had not been paid, and did not know when it would be paid, and he stated that he felt like revoking the assignment which he had made, and Mr. Bradshaw told him that the assignment could not be revoked.

Nothing was done until July 30, 1931, when Mr. Bradshaw went to Washington, D. C., to find out about

this fee. He talked with Richard F. Doyle, a member of the firm of Hamel, Doyle, Park and Saunders, and he told him that this fee had already been paid on May 4, 1931, $9,000 to E. A. Ford Barnes individually, and that a check for $2,000 had been made out to H. H. Swaney for his part of this fee. Bradshaw secured at that time from Mr. Doyle a photostatic copy of the check for $9,000, and returning to Pittsburgh, stopped at the William Penn Hotel on the evening of July 31, 1931, and arranged to meet Mr. Barnes the next morning. When they met, Mr. Bradshaw asked him what was holding up this Union Drawn Steel Company fee, and Barnes told him that there was about forty-one things holding it up. Among other things, he stated that the Republic had become involved in it in some way, and that he was having an argument with Hamel about the amount of it and about some expenses which should be charged to it. He was asked by Mr. Bradshaw if he had been paid anything on account of it, and he said no. He was asked if he could not get something paid on account, and he said no, and that the matter had better be settled once and for all at one time. He was asked the amount of it again, and he said that it would be $15,000, in round numbers, and that Sexton had a one-half interest in this fee, which would be $7,500. He was asked expressly what Sexton would get out of it, and he said $7,500. He was asked if he had paid Sexton anything since the assignment was made, and he said about $800; and he was asked if he was sure he had not been paid anything on account of this claim and he said no. Then he was shown the photostatic copy of the check received by Bradshaw from the attorneys in Washington, and then he said that Sexton did not have anything in that fee. Mr. Bradshaw then told him that he had cheated him and that he wanted $4,500 as Sexton's share of the fee received by Mr. Barnes, and Mr. Barnes told him that he would not get it from him. They had some

further conversation, and Mr. Bradshaw told him that he would give him until Monday to pay that $4,500. Mr. Bradshaw heard nothing further from either Sexton or Barnes, and on August 3, 1931, these prosecutions were started.

"The evidence given at the trial also showed that sometime before May 4, 1931, Barnes and Sexton both went to Washington, Sexton went because, as he said, he was interested in this fee, and while at Washington they went to the office of Hamel, Doyle, Park and Saunders, and finding out that the fee in question had been paid by the Republic Steel Company to the Washington attorneys, they adjusted the amount coming to Barnes and Company at $9,000, and a check for $2,000 was made out to H. H. Swaney as his share, and a check for $9,000 made out to Barnes and Company; but at the request of Mr. Barnes this check was recalled and a new check made to E. A. Ford Barnes individually. Both of these checks were received by Sexton or Barnes in the presence of both of them. The one for $9,000 was finally turned over to Mr. Barnes, and the one for $2,000, payable to Mr. Swaney, was turned over to Mr. Sexton. Mr. Sexton took the check for $2,000 with him to his home in Beaver, called Mr. Swaney over the telephone and told him that he had a check for $2,000, payable to him, but that he (Swaney) was only entitled to $1,500 out of it; and told Mr. Swaney that he was ready to deliver the check to him upon the delivery of $500. He said this $500 deduction was on account of some expenses, and Mr. Swaney authorized him to sign his name to the check and turn over to him a check for $1,500 in payment of his share of the Union Drawn Steel Company fee. This check for $1,500 was taken by Mr. Sexton to Mr. Swaney and delivered to him at his office in Beaver Falls. The check for $9,000 was brought by Mr. Barnes from Washington to Pittsburgh, and he there deposited it in a new account in his own name in the Duquesne Na-

tional Bank of Pittsburgh, where Barnes and Company never had an account, neither then nor since, and where H. Clay Sexton did keep his private account. On May 13, 1931, a check was given by Mr. Barnes on this account to H. Clay Sexton for $1,000, and this check was deposited by Mr. Sexton the same day in his own private account in the same bank. Various checks were drawn by E. A. Ford Barnes on this account, the largest one being for $3,120, on May 13, 1931, and by July 30, 1931, all of the funds deposited by Mr. Barnes in the Duquesne National Bank had been withdrawn and the account balanced. Mr. Barnes' explanation of the $1,000 check given to Mr. Sexton on May 13, 1931, was that this amount was given to him for the purpose of paying an indebtedness of $1,000 owed by Mr. Barnes to a man named Solomon of the City of Pittsburgh. This we do not believe.''

The assignments of error allege the refusal of the court to quash the indictments, the refusal to give binding instructions in favor of defendants, the refusal of certain requests for instructions, the rulings upon evidence and instructions to the jury.

1. Appellants contend that the court was without jurisdiction on either of the two counts of the indictments, and that the record shows no evidence from which the jury could properly have found that any conspiracy was entered into between Barnes and Sexton to defraud the prosecutors.

The sole questions involved on this feature are the jurisdiction of the court of quarter sessions of Beaver County to try the defendants on the charge of fraudulent conversion and conspiracy, and the sufficiency of the evidence to sustain the verdict.

The jury found that the offense of conversion was committed in Beaver County. The court below has found that it must be held as a matter of law to have been committed in Allegheny County. The court further held that the offense of conspiracy was completed

in Beaver County, giving jurisdiction as to that offense. We shall consider first the question of jurisdiction on the charge of conspiracy, and defer discussion of the question of jurisdiction on the charge of conversion until we take up the appeals of the Commonwealth.

In indictments for fraudulent conspiracy, according to the decided cases, the venue may be laid in any county in which it can be proved that an overt act was done by any of the conspirators in furtherance of their common design: Commonwealth v. Gillespie, 7 S. & R. 469, 477; Commonwealth v. Corlies, 3 Brewster's Rep. 575, 578; Commonwealth v. Westervelt, 11 Phila. 461, 464; Commonwealth v. Spencer, 6 Pa. Superior Ct. 256, 268. As stated by DUNCAN, J., in Commonwealth v. Gillespie, supra, "It must be recollected the conspiracy is a matter of inference, deducible from the act of the parties accused, done in pursuance of an apparent criminal purpose, in common between them, and which rarely are confined to one place; and if the parties are linked in one community of design and of interest, there can be no good reason why both may not be tried where one distinct overt act is committed; for he who procures another to commit a misdemeanor is guilty of the fact, in whatever place it is committed by the procuree."

The common design of the defendants was to cheat and defraud Mrs. Thompson and Mrs. Dawson of the $4,500 assigned to them on April 14, 1931 by H. Clay Sexton, and to conceal from them all knowledge of the fact that the defendants had on May 4, 1931, received this sum of money from the Washington attorneys.

As stated in the opinion of the lower court, when Sexton went to the office of Bradshaw in Beaver, Beaver County, about June 20, 1931, and told him that he knew nothing about the Union Drawn Steel Company fee, and that no part of it had been paid to him

or to Barnes and Company, he then did an overt act in said county in furtherance of their conspiracy to defraud. The mere going to the office of May and Bradshaw pursuant to the request in the letter of Mr. Bradshaw of date June 18, 1930, while an overt act, cannot be considered an act in furtherance of the conspiracy. When, however, he deliberately lied to Mr. Bradshaw about the Union Drawn Steel Company fee, then he was doing something in furtherance of their common design, a part of which would be the concealment from Mr. Bradshaw of the fact that this money had been received by him and Barnes.

"Overt" is defined in 46 C. J. 1163 thus: "Manifest; open, public; issuing in action as distinguished from that which rests merely in intention or design." And an "act" is defined by the same authority as "that which is done or doing; the exercise of power, or the effect of which power exercised is the cause and performance; a deed."

Speaking, then, is "overt" as distinguished from something hidden or merely existing in intention or design, and speaking is an act, as "speech" is defined by Webster: "Act of speaking."

When Sexton went to the office of Mr. Bradshaw on June 20, 1931, and told him what he did, then he was committing an overt act in this case in furtherance of the common design to defraud Mrs. Thompson and Mrs. Dawson and conceal their fraud. The way Barnes and Sexton acted in Washington, D. C., when the fee was split into two parts; the way Barnes had the first check written to Barnes and Company withdrawn, and the check written to him individually; the way from that date on down even to August 1st, both defendants time after time denied having received a fee; the way Barnes ignored the letters of May and Bradshaw; the way Barnes set up a new bank account in a new bank, and on July 30th, the day of Bradshaw's visit to Washington, closed out the account; their close busi-

ness associations, which, if not one of partnership, is practically the same thing, with Sexton empowered to sign for Barnes and Company, not a corporation, as its treasurer; all of these things show, as was said in Commonwealth v. Altland, 79 Pa. Superior Ct. 43, 47, that they pursued "by their acts the same object, often by the same means, one performing one part of the act, the other another part of the same act, with a view to complete it and to attain the object which they were pursuing; the acts of each must necessarily be proved separately, and such acts are evidence against that particular defendant."

Conspiracy arises from confederation in word and deed. Each defendant aided and abetted the other by telling for months what was not true. If Sexton had disclosed payment of the fee, Barnes could not have succeeded to the extent he did. If Barnes had disclosed the fee, Sexton could not have succeeded to the extent that he did. They had unity of purpose, unity of design, and unity of word and deed.

Appellants contend that the testimony of what Sexton said to Bradshaw at the latter's office on June 20, 1931, that he had not been paid and he did not know when it would be, was not competent evidence against Barnes because made weeks after the receipt of the money. This loses sight of the fact of similar and repeated statements at or about the same time by Barnes. Conspirators never act in the open or at the same time. It can only be established from circumstances. The conspiracy was to defraud by enabling Sexton to convert the money improperly diverted by the payment by Barnes to Sexton. The conversion did not take place until Sexton refused in June to pay over the money after he had denied its receipt.

The court below, in its opinion, discussing the question of jurisdiction on the conspiracy charge, says: "In order to give the court of Beaver County jurisdiction of the conspiracy charge there must be an

overt act committed in the county of Beaver in furtherance of the common design, and while technically, when Barnes was talking to Mr. Bradshaw from Allegheny County to Beaver County it might be considered that his speaking in that manner was an act committed in Beaver County, in our opinion it cannot be considered in a criminal action as such an overt act committed in this county, and we prefer in this case, to base the jurisdiction of this court upon the conversation of Sexton in Mr. Bradshaw's office on June 20th, and not upon the conversations over the telephone between Mr. Bradshaw and Mr. Barnes, although it might be that it could be held, if it were necessary, that such a conversation over the telephone was an overt act committed by one of the conspirators in this county."

The writer of this opinion, speaking for himself, would hold that the telephone conversation of Barnes with Bradshaw in the middle of May from Pittsburgh to Beaver, wherein Barnes falsely represented that the fee had not yet been paid, was an overt act committed in Beaver County. The law must keep pace with modern scientific developments. When Barnes personally put in motion at Pittsburgh the instrumentality of the telephone by which his voice was reproduced at Beaver and communicated directly to Bradshaw, it was just the same as if Barnes had gone to Beaver and personally delivered his message by word of mouth to Bradshaw. It was intended by Barnes that his message was to be effective in Beaver County.

In the language of the lower court, "In our opinion there was abundant evidence to justify the jury in finding that the defendants were guilty of a fraudulent conspiracy. All any one needs to do is to read the evidence in this case on the part of the defendants. The manner in which they testified, and what they said bears all the earmarks of falsity ...... They contradicted themselves time after time, and their testimony

was so unreasonable that the jury was perfectly justified in finding them guilty as they did.'' A careful examination of the testimony has impressed us in like manner.

2. Appellants contend that the claim on which Barnes received the $9,000 fee was an abatement claim, and not a refund claim, and therefore, no part of that fee passed by the assignment.

This was in our opinion properly disposed of by the court below whose language in the opinion by McCon-NEL, J., is adopted by us as a clear and concise answer to the proposition, fully justified by the evidence, and is as follows: ''In our opinion this was a fact to be determined by the jury and was properly submitted to them and the question properly determined by them. When Mr. Bradshaw went to Pittsburgh on April 14, 1931, he went there for the purpose of finding out whether there was an actual fee due and payable to Mr. Sexton, or whether it only existed in his imagination, and it is perfectly evident that the fee which they talked about and which they considered was one in which the claim had been settled and adjusted just a few days before that, and the assignment says that they are considering in the assignment certain fees which Sexton at that time, or shortly thereafter would be entitled to receive on account of a federal tax assessed against the Union Drawn Steel Company of Beaver Falls, Pennsylvania, which fee was to be first paid to Charles D. Hamel of Washington, D. C., and then to Barnes and Company of Pittsburgh, and that out of this fee Sexton was entitled to fifty per cent. It is perfectly clear that the fee which was intended by Sexton to be assigned to May and Bradshaw was this fee, though it is called in the assignment a 'refund case.' It was a settlement of a tax for 1918, and under the evidence this claim was a refund and an abatement or deficiency claim. The parties never intended to consider any claim of the Union Drawn Steel Company

except the claim which had been settled a few days before, and in which the money was expected to be paid within a week or ten days, and it seems to us that when Sexton and Barnes say that they thought the fee intended to be assigned was what might be problematically adjusted in the future on the 1917 or 1918 claims, they are simply telling what is not true, and we can see no reason why the Commonwealth could not show exactly what fee was intended to be assigned by this writing and what the parties intended to transfer to May and Bradshaw by it. The writing is not specific nor clear as to exactly what was intended to be assigned, and under those circumstances parol evidence may be offered to show what was intended by the parties, or to identify the thing assigned. As it is said in 5 C. J. 899, section 64, under assignments: 'The subject matter of the assignment should be described with such particularity as to identify it, but no greater particularity is required than is actually necessary to do this, with the aid of the attendant and surrounding circumstances. If the interest or claim assigned is sufficiently described to be identified it is not necessary to state the amount.' The surrounding circumstances, as we see it, clearly identify the assignment as transferring the amount received by E. A. Ford Barnes on account of the settlement of the 1918 tax of the Union Drawn Steel Company, and the jury properly so decided.''

3. The next contention of appellants is that the Act of May 8, 1917, P. L. 241, creating the offense of ''fraudulent conversion,'' was not intended to apply to the withholding by an obligor from an assignee under an equitable assignment of an unliquidated fee or commission due the assignor. We cannot agree with this contention. The defendants on May 4, 1931, had in their hands $4,500 actually belonging to May and Bradshaw as attorneys for Mrs. Thompson and Mrs. Dawson, and having this actual fund in their posses-

sion, they fraudulently converted it. At the time of the assignment, the case out of which the fee arose had been successfully terminated. The time for payment, under the assignment, was fixed as the time when payment would be made by Hamel to Barnes and Company. The moment the fee was received by Barnes, it was earmarked. It was property of Sexton which had been assigned to May and Bradshaw as attorneys, and belonged to the latter. The authorities cited by appellants are readily distinguishable from the instant case and have no application.

4. Appellants assign as error the exclusion of testimony of defendant, Barnes, of an indebtedness on the part of Sexton to him in an amount exceeding any interest of Sexton in the fee in question, as prejudicial to defendants.

While the court below did sustain an objection to a question put to Barnes as to whether or not Sexton was on April 14, 1931, indebted to him in an amount in excess of any interest of Sexton in the fee in question, nevertheless the evidence of the alleged indebtedness got into the case on the examination of Sexton. Sexton was interrogated and answered: "Q. You say you had a credit of $1,200? The court: He has already said that. Q. What do you mean by credit? A. Credit at the time this came through. I was indebted to the firm in approximately $4,000, and this $1,200 was applied against the $4,000 indebtedness which Mr. Barnes had against me."

In respect to this claim of indebtedness the court charged the jury as follows: "Mr. Barnes may also have honestly believed that he was entitled to take out of the fund due Mr. Sexton the amount that was due to him, or was alleged to be due to him, from Mr. Sexton on account of the indebtedness of Mr. Sexton to him. As we recollect Mr. Barnes' testimony, he says that Mr. Sexton was indebted to Barnes and Company at the time that this money came into their hands,

to the extent of $4,000, and he supposed that he was entitled to take that sum out of these funds, and he admits, as we recollect it, that out of this $9,000 that came into his hands Sexton was entitled to $1,200, and he says that he thought that he was entitled to take out of that fund the amount that Sexton owed the firm of Barnes and Company. Now, if he honestly thought that, or had reasonable grounds to believe it, then it would not be a dishonest act upon his part in taking this money that came into his hands, belonging to Sexton, and applying it to an indebtedness of Sexton to him."

Defendant Barnes was therefore not prejudiced by the ruling referred to.

In addition, the question was directed as to an alleged indebtedness on April 14, 1931, the date of the assignment. While there can be no question of the right to set off an indebtedness existing at the time of an assignment as argued on behalf of appellants, the question in the instant case should have been directed to the existence of a set-off or counterclaim on May 4, 1931, the date of the receipt of the money by Barnes. Non constat the alleged indebtedness of Sexton on April 14th may not have been paid between said date and May 4th.

With the submission to the jury on this point as above indicated, the failure of the jury to regard this testimony as worthy of belief can only be attributed to the contradictory statements of defendants in their testimony, evoking the comment of the trial judge in his opinion on this matter, "The truth was not in either Barnes or Sexton at any time."

5. Appellants further urge as error the refusal of the court to strike out all the testimony of Bradshaw as to what was said and done in the absence of Barnes prior to the actual execution of the assignment.

Both defendants were being tried together. The testimony referred to was at least competent as to

Sexton and it would have been error to allow the motion.

In addition, there was in evidence the testimony as to the conversation between Bradshaw and Barnes in the presence of Sexton at Barnes' office on April 14th, prior to the execution of the assignment, wherein there was a repetition of what had transpired between Bradshaw and Sexton in their prior meetings. We do not see that the refusal of the motion was in any way prejudicial to Barnes under the circumstances.

6. Appellants assign as error the refusal of the court to allow the introduction of testimony on behalf of Barnes to show that he consulted his legal counsel within the time fixed by Bradshaw for the payment of the money, laying before them all the facts and was advised that he was under no obligation to honor the assignment.

The opinion of the lower court on this proposition, which we quote below, contains a complete answer to this assignment: "The defendant wanted to offer evidence that after Mr. Bradshaw, on August 1, 1931, had told Mr. Barnes that he, Bradshaw, had been cheated and that he had not been telling the truth about the $9,000 fee; that after he had demanded from Mr. Barnes one-half of that fee, that he, Barnes, consulted his counsel and that he was advised by his counsel that in their opinion he was under no legal obligation to honor the assignment in question; this for the purpose of showing, or tending to show good faith on the part of the defendant. This offer would have been admissible if the time fixed for the consultation with his counsel had been before the defendants had misappropriated the money belonging to Mrs. Thompson and Mrs. Dawson; but on August 1, 1931, the misappropriation by Mr. Barnes was fully completed, and any declaration made to him after that time by his counsel would have been, in our opinion, clearly inadmissible. It could not be anything unless it was a self serving decla-

ration, and could not possibly bear upon his misappropriation of this money long prior to August 1, 1931. As a matter of fact, every cent of this fund had been misappropriated by the defendant Barnes prior to July 31, 1931.''

7. Appellants urge as error the refusal to charge as requested by Sexton that his signature to the assignment was obtained from him by duress to procure his release from the custody of armed officers.

The point in question was as follows: ''The burden is upon the Commonwealth to prove to you beyond any reasonable doubt that the circumstances surrounding the making of the assignment by H. Clay Sexton to May and Bradshaw were free from all duress ......''

The burden was not upon the Commonwealth to disprove duress. Duress is a substantive defense, and the burden is on the defendant to prove it. The point was rightly refused as not being a correct statement of law.

After a careful examination of the record and the able brief of counsel for defendants, we feel that no error was committed by the trial court that would justify a reversal. The cases were well tried and fairly submitted. We feel that the respective verdicts on which sentence was pronounced were fully justified under the evidence.

The assignments of error are overruled. The respective judgments in the appeals at Nos. 166 and 167 April Term 1932 are affirmed, and it is ordered that the defendants appear in the court below at such time as they may be respectively there called so that each may be by that court committed until he has complied with the sentence imposed upon him.