No. 10,656.

PEPPER v. THE PEOPLE.

Decided May 5, 1924.

Plaintiff in error was convicted of obtaining money by false pretenses.

*Affirmed.*

1. CRIMINAL LAW—*False Pretenses—Evidence.* On reviewing the record, it is held that there was ample evidence to sustain a conviction of obtaining money by false pretenses.

2. *False Pretenses—Completed Offense.* The offense of obtaining money by false pretenses is complete when the money or property has been obtained by such means, and cannot be purged by subsequent restoration or repayment.

3. *False Pretenses—False Promise—Presumption.* In a prosecution for false pretenses, defendant having made a false promise

and a false statement of fact in the transaction; where the court instructed the jury that reliance upon the false promise would not justify a conviction, it is held that the presumption must be that the jury in returning a verdict of guilty found that reliance was had upon the statement of fact.

4.   *False Pretenses—Venue.* Defendant in a false pretense case made the alleged false representation in Custer county, where he drew a draft for the money obtained, which was paid by the complaining witness at a bank in Denver county. Held, that when the money was paid to the bank, the defendant then and there received it through the bank as his agent, and that the proceeding was properly brought in Denver county.

*Error to the District Court of the City and County of Denver, Hon. Charles C. Butler, Judge.*

Mr. S. HARRISON WHITE, Mr. PHILIP W. MOTHERSILL, for plaintiff in error.

Mr. RUSSELL W. FLEMING, Attorney General, Mr. HAROLD CLARK THOMPSON, Assistant, for the people.

MR. JUSTICE SHEAFOR delivered the opinion of the court.

THE defendant was convicted of the crime of obtaining by means of false pretenses, the sum of $4,250 in money from the McKee Live Stock Commission Company, of the value of $4,250, and was sentenced to a term in the penitentiary. He brings the case to this court for review.

The false pretense alleged was that on the 19th day of February, 1920, at the City and County of Denver, the defendant falsely represented to the McKee Live Stock Commission Company that he had on that date purchased 39 head of steers for the sum and price of $4,250, and that the cattle so purchased were the property, and in the possession, of the person from whom he purchased them at Westcliffe, Colorado; that the cattle would be loaded and shipped the following Monday to the McKee Commission Company at Denver, Colorado, for sale by it on commission, and that defendant had already given the person from whom he purchased the cattle, a draft for $4,250,

on the commission company, in payment for the cattle, signed B. Pepper & Co.

It appears from the record that for some 10 or 12 years prior to February, 1920, the defendant had been doing business with the McKee Live Stock Commission Company, in the way of buying cattle and shipping them to the McKee Company to be sold by it on commission, paying for the cattle he purchased with drafts drawn on and paid by the commission company. On February 9, 1920, the defendant was owing the commission company about $10,817.77, which was unsecured, and also owed them for cattle that were in the country, upon which he had given the commission company a mortgage, as security, and on that day defendant and the McKee Commission Company, through Charles R. McKee, had a settlement of their affairs. In the conversation at that time McKee told the defendant that the company would not pay any more drafts drawn by the defendant, unless defendant had the cattle and had them ready to ship and shipped them, so that the cattle would arrive at the stockyards at the same time the draft would; that thereafter he would pay no drafts that were made payable to the bank at Westcliffe; that defendant must make the drafts payable to the person from whom he purchased the cattle, and on the drafts it must be stated for what he was paying; and defendant said in reply that thereafter he would do as McKee required. At that time, in settlement of the $10,817.77 unsecured indebtedness, owed by defendant to the commission company, he gave the company two checks, one for $6,000 and one for $4,817.77 drawn on the Tomkins bank at Westcliffe. The $4,817.77 check was deposited by the McKee company February 10, and the $6,000 check February 14. On February 19 defendant called McKee on the 'phone from Westcliffe, and McKee testifies that in the 'phone conversation defendant told McKee he had bought about two loads of steers; that he had them at Westcliffe and could not ship them on account of the car situation; that he had drawn a draft for $4,250 in payment of the steers and asked

McKee to pay the draft, and that he would ship the cattle the following Monday. McKee at first refused, but finally consented, saying to defendant, that if he had already bought the cattle and had paid for them with the draft, and would promise to ship them the next Monday he, McKee, would pay the draft. The draft came on the 21st of February, was drawn in favor of Floyd Thompson, and was paid by the commission company to the First National Bank in Denver. The draft had a marginal notation showing that it was given in payment for 39 three year old steers. No steers were ever received by the McKee Commission Company for the $4,250 draft. McKee stated in answer to a question as to what reliance he placed upon the writing upon this draft, that he had relied upon "February 19, 1920, $4,250, for 39 head of 3 year old steers, purchased from Floyd Thompson." He testified that he did not know who Floyd Thompson was at that time, and did not know that he was the cashier of the Tomkins bank; that he believed him to be the owner of the 39 head of steers and had sold them to Pepper. The evidence further shows that at that time Floyd Thompson was assistant cashier of the Tomkins bank at Westcliffe; that he did not own any cattle on February 19, and never had owned any, and that he sold none to Pepper. The evidence further shows that the proceeds of the $4,250 draft were deposited in the bank at Westcliffe, to the credit of defendant, and applied, together with other money of defendant on deposit in the Westcliffe bank, to the payment of the $6,000 check which had previously been given by defendant to the McKee Commission Company, and Thompson testified that without the proceeds of that draft, the $6,000 check could not be paid.

The principal defense relied upon by the defendant is that the evidence was wholly insufficient to justify a verdict of guilty, and that the court should have sustained his motion for a directed verdict. Defendant testified that at the time of his 'phone conversation with McKee on February 19, he had bought the cattle and had them when he

drew the draft; that they were purchased from James Belknap; that they consisted of 39 three year old steers; that he had paid for them with a check on the Tomkins bank; that the amount paid for them was over $4,000 and not over $4,250.

Thompson testified that on February 18 the bank paid one of Pepper's checks for approximately $4,800, but did not remember whether it was payable to a cattleman or not. The testimony of Thompson, corroborated by the ledger sheet of the bank, shows, that only one check of defendant for $4,817.77 was paid by the bank during the month of February, and that was paid February 18; that there was no check of defendant for an amount over $4,000 and not over $4,250 paid during that month, and this disproves defendant's statement. It quite clearly appears that the $4,817.77 check paid February 18, was the one given by defendant to the McKee Live Stock Commission Company February 9. Defendant claims corroboration by the testimony of Perry A. Nelson, who had been stock inspector at Westcliffe for 6 or 8 years. But we think Nelson's testimony does not corroborate that of defendant.

In his direct examination Nelson was asked this question: "Do you know about a bunch of about 39 steers that Mr. Pepper bought of Jim Belknap in February, 1920? A. Yes sir. * * * Q. Do you know where those steers were purchased—or where those steers were put in February, after they were purchased by Mr. Pepper? A. Put on his ranch."

In his cross examination Mr. Nelson testified: "Q. Do you remember the exact date when Mr. Pepper bought the cattle from Mr. Belknap? A. I do not. Q. Do you know whether it was in the month of March, perhaps, that he bought the cattle? A. I know it was in the spring of the year. Q. You know it was in the spring of the year? A. After the first of the year sometime; it was along toward the spring. Q. You mean after the first of January, along towards the spring sometime? A. Yes sir, sometime after that. Q. But you do not know the

date? A. I cannot call the date. Q. You cannot tell for sure whether it was in the month of February, can you? A. No sir, I cannot."

That is the entire testimony of Nelson on that point, and from which it will be seen that he does not even pretend to say that the cattle were purchased from Belknap in the month of February.

The evidence of the defendant was at times evasive and unsatisfactory. A careful examination of the entire evidence in the case leads us to the conclusion that there was ample to sustain the verdict of the jury.

The defendant contends that the commission company was not defrauded by the transaction, and therefore the defendant could not be found guilty. This contention is based upon the fact that the proceeds of the $4,250 draft was used in the payment of the $6,000 check which he had previously given the commission company.

We cannot agree to this contention. We cannot assent to the proposition that one may pay his debt by obtaining money by means of a false pretense, even though by such pretense he obtains it from the one to whom he is indebted and pays that debt with the money so obtained.

When defendant represented that he owned the cattle; that he had paid for them; that he had drawn a draft on the commission company in favor of the person from whom he had bought the cattle, and when he obtained the money on the draft, by payment made to the First National Bank in Denver, by the commission company, if the representations which he made for the purpose of obtaining payment of the draft were false, then the offense was committed when the money was obtained, and he obtained it when it was paid to the bank. "However, the gravamen of the offense is in making the false pretense, and obtaining thereby a person's property or signature, and does not depend upon ultimate loss to the victim or whether in fact he sustains any pecuniary loss. * * * Neither a promise to repay nor an intention to do so deprives the false and fraudulent act in obtaining it of its criminality.

The offense is complete when the money or property has been obtained by such means and cannot be purged by subsequent restoration or repayment. * * *" 11 R. C. L. 843, 844. 25 C. J. 615; *State v. Holmes,* 98 Kan. 174, 157 Pac. 412, L. R. A. 1916 F, 11.

Defendant cites the case of *Roberts v. People,* 71 Colo. 198, 205 Pac. 272, as authority for the proposition that to justify a conviction on the charge of obtaining money by means of false pretenses, there must be positive evidence that loss was sustained. In that case the court found that no loss had been sustained, that Miller had suffered no loss by reason of what the defendant did. In the instant case the jury found that loss was sustained and the McKee Commission Company was defrauded, and we think the evidence justifies the finding.

The evidence sufficiently shows the criminal intent, and also sufficiently shows that the McKee Commission Company relied upon the representation, as to the ownership of the cattle, at the time the draft was drawn, and at the time the representations were made, and not upon defendant's promise to ship them the following Monday.

The court having instructed the jury that reliance upon the promise to ship the cattle on Monday following February 19 would not justify a conviction, the presumption must be that the jury found that McKee relied upon defendant's statement concerning his ownership of the cattle. When a false statement of fact is coupled with a false promise, "* * * the statement of fact and the promise may be considered as together constituting the false pretense and a conviction may follow, or, if the statement of fact and the promise can be separated and prosecutor relied in part on the former, the promise may be disregarded and accused be convicted on the statement of fact." 25 C. J. 594, § 15.

The defendant contends that the money was obtained by him in Custer county and not in the city and county of Denver, and therefore defendant could not be convicted in the latter county. We do not concur in this view. When

the money was paid to the First National Bank in Denver, the defendant then and there received it.   The bank in Denver received it as the agent of the defendant.   The McKee Commission Company lost its property in the money, and its dominion over it, in Denver county, upon the representations made by the defendant in Custer county, and the court properly instructed the jury in that respect.

The defendant in support of his position, that the venue was in Custer county, cites among other authorities 11 R. C. L. 854, § 36, but we think that authority does not sustain him.   He quotes it in his brief as follows:   "Within the rule that a crime must be prosecuted in the jurisdiction where it is committed, a prosecution for criminal false pretenses must be had in the county where the offense was consummated by the obtaining of the property, even though the inducing pretenses were made elsewhere and the consummation by delivery of the property was effected through the instrumentality of an innocent agent."

Other authorities might be cited but we deem it unnecessary.

Finding no error in the record the judgment is affirmed.

MR. CHIEF JUSTICE TELLER and MR. JUSTICE CAMPBELL concur.