No. 12,989.

UPDIKE *v.* THE PEOPLE.

(18 P. [2d] 472)

Decided January 7, 1933. Rehearing denied January 30, 1933.

Mr. DEAN DRISCOLL, Mr. JOHN L. NOONAN, Mr. W. F. NOONAN, for plaintiff in error.

Mr. CLARENCE L. IRELAND, Attorney General, Mr. WALLACE S. PORTH, Assistant, for the people.

*En Banc.*

MR. CHIEF JUSTICE ADAMS delivered the opinion of the court.

J. T. UPDIKE was found guilty of obtaining money from Theodore Zadra by false pretenses. The defendant was sentenced to the penitentiary and prosecutes error to review the judgment.

The evidence in support of the information shows, among other things, that there were two corporations by the name of the Updike Sheep Company, one of which was organized under the laws of the state of Colorado and the other under the laws of Idaho. Zadra was a large stockholder in the Colorado corporation, but owned nothing in the Idaho company if he even knew of its existence. Defendant managed, and had an interest in both companies, but his greater interests by far were in the Idaho concern, of which he was president. Defendant was an experienced sheep man, but Zadra was not, and one of defendant's methods of deceiving Zadra was to lead the latter to believe that the Colorado corporation owned large quantities of sheep and hay; but in truth, if owned at all, such property was owned by the Idaho company. Defendant also gave Zadra to understand that the latter's investments, for which he sent money or checks to defendant, were being used in the business of the Colorado company. The fact was, however, that defendant knowingly and designedly obtained and diverted most, if not all, of such funds to his own use or to the

Idaho corporation. A check in the sum of $5,000 given by Zadra to defendant was so employed, and defendant admitted on cross-examination that title to the sheep and hay purchased in the fall of the year 1928 was taken in the name of the Idaho company. At last accounts, the Colorado corporation did not own any sheep or hay whatsoever.

Updike lived in Boise, Idaho. The representations were made in letters written by him in Boise and directed to and received by Zadra at Glenwood Springs, Colorado, and by telephone communication by Updike in Boise to Zadra in Denver. Relying upon the representations, Zadra mailed his check to Updike, who received it at Boise and cashed it there. The check was drawn upon the First National Bank of Glenwood Springs, and was payable to the order of Updike. The check bears Updike's endorsement, and also the endorsements of the Updike Sheep Co., the First National Bank of Idaho, the Colorado National Bank and the Denver branch of the Federal Reserve Bank of Kansas City. Zadra's check was paid by the drawee bank at Glenwood Springs.

The statutory crime of which defendant was convicted is set forth in section 6930, C. L. 1921, which reads in part as follows: ''If any person or persons shall knowingly and designedly, by any false pretense or pretenses, obtain from any other person or persons any chose in action, money, goods, wares, chattels, effects or other valuable thing whatever, with intent to cheat or defraud any such person or persons of the same, every person so offending shall be deemed a cheat, and upon conviction, shall, where the property obtained is over the value of twenty dollars, be imprisoned in the penitentiary not to exceed ten years. * * *''

1. The information states at considerable length the fraud perpetrated on the prosecuting witness. Solely with reference to a question raised by defendant in attempting a distinction between money and a check for like amount, we quote from that part of the informa-

tion which charges the defendant with fraudulently obtaining "$5,000.00 of the value of $5,000.00 of the personal property, goods, chattels and monies of the said Theodore Zadra," etc. It does not contain any specific reference to a check, and counsel for defendant claim that there is a defect in the information, meaning, we suppose, a variance between the allegation and proof, because, they say, "the transaction relied upon was based upon a bank check, not upon cash." The objection is not well taken. We have repeatedly declared that technicalities not affecting substantial rights will not be considered. It is of no consequence whether the property fraudulently obtained was money or a check, as long as it was a thing of value, and in this instance, of exactly the same value, indeed, when it represents precisely the same thing. As we said in *Arnett v. People,* 91 Colo. 56, 11 P. (2d) 806, "It is further urged that the evidence is insufficient to support the verdict because defendants received checks and not money. They received checks and Cross' money thereby authorized to be paid. In these circumstances, it would seem ridiculous to hold that such variance between allegation and proof constitutes reversible error. *Compton v. People,* 84 Colo. 106, 268 Pac. 577."

In *Roll v. People,* 78 Colo. 589, 243 Pac. 641, the contention was made that a check was not property, but we said at page 593 of the opinion: "Our own statute and decision settle the question in this jurisdiction. Much musty learning is thus made superfluous, and we need not delve into it. Fortunately so, for in this commercial age a solemn judicial decision that a check for $7,000, backed by a bank account to cover it, and actually cashed by the payee, is not property, would require neither argument nor precedent to make it ridiculous."

*Briggs v. People,* 76 Colo. 591, 233 Pac. 836, is another case somewhat in point. One of the charges against the defendant there was that he feloniously misapplied a check with intent to defraud a bank, but we said on page

595 of the opinion that whether it was check, cash or draft is wholly immaterial, and also this: "In other words he put the bank's money in his pocket and spent it." This terse dismissal of a specious argument might well be applied to the present case.

2. Counsel for defendant inform us that their main contention is that the district court of Garfield county is without jurisdiction. Their theory is that if a crime was committed at all, it was committed in the state of Idaho, for the reason that defendant was charged with the crime of fraudulently obtaining money, and the money on the check was obtained in the state of Idaho. This is said regardless of where the check was obtained, and to emphasize the fact that defendant received the money in Idaho, counsel for defendant insist that the court erred in rejecting an offer of proof that the check was deposited by defendant in the Idaho bank as a cash item, that it was received and accepted as such, and not for collection from the bank at Glenwood Springs on which the check was drawn. It was a bold concept to admit that money instead of a check was obtained by defendant, even for the obvious purpose of defeating the jurisdiction of the Colorado courts, but it does not avail. The rejection of such proof was not prejudicial to defendant; its admission would have served only to aid the cause of the state, in demonstrating the value of the check and that defendant converted it to his own use, if further proof had been needed. This and other elements of the crime were fully proven.

3. A crime is an injury to the state where it is committed, and the courts of that state have jurisdiction thereof; this is not disputed. In 16 C. J., at pages 190, 191, section 273, it is said: "The general rule is that the crime of obtaining money or property by false pretenses is completed where the money or property is obtained, and that, if the pretenses are made within one jurisdiction and the money or property is obtained in another, the person making the representations must be in-

dicted within the latter jurisdiction. The same rule is applicable to the obtaining of money by means of the confidence game.''

In line with the above, this court has declared that the crime of obtaining money by false pretenses is committed where the property is obtained by the defendant. *Pepper v. People,* 75 Colo. 348, 225 Pac. 846; 11 R. C. L. 854. It narrows the question to a determination of where the property or thing of value was obtained. We quote further with approval from 16 C. J. page 191, section 273: ''Transmission by mail. Where, induced by false pretenses, one transmits by mail to defendant money, drafts, or other writings, such mailing is a delivery to the postmaster as the agent of the defendant, to be forwarded to him, and the offense is committed where the letter is mailed, and is indictable at such place.'' A similar statement will be found in 11 R. C. L. 854, although the text in R. C. L. quotes authority to the contrary.

 The time of the completion of the offense of obtaining money by fraud was determined in *Stoltz v. People,* 59 Colo. 342, 148 Pac. 865. Section 6930, C. L. 1921, above quoted is a reprint of section 1849, R. S. 1908, and we said at page 347 of the opinion in the Stoltz case, ''We think the offense under the statute, sec. 1849, R. S. 1908, is complete *when* (our italics) a thing of value has been obtained, knowingly and designedly from another, by false representations or pretenses, with an intent to cheat or defraud such person of such property, * * *.''

4. It does not make a particle of difference whether the fraudulently obtained check was sold by defendant in Idaho, as his counsel assert, or deposited there for collection. The question is not where he sold it, but where he obtained it; and whether he sold it or deposited it for collection, or where or in whatever manner he may have disposed of his booty theretofore obtained, is beside the question. The subsequent history of the travels of the check are only incidental; after the crime was committed, it is immaterial who eventually got the check or its pro-

ceeds. *Whitfield v. People,* 79 Colo. 108, 113, 244 Pac. 470.

As we have said, Zadra's check was mailed at Glenwood Springs, Garfield county, Colorado, to defendant. There it was delivered to the postmaster as agent of defendant; then and there defendant so obtained it; it completed the offense, and the venue was properly laid in Garfield county.

If we take defendant at his word that it was money as such, instead of a check, which he is charged with obtaining by fraud, it nevertheless means the money which Zadra had on deposit at Glenwood Springs, obtained there and used to replace that which defendant got on the check from the bank at Boise. He is neither charged nor convicted here with obtaining any money at all in Idaho.

5. Another ingenious argument is advanced to fix the situs of the crime outside of the state of Colorado. It is suggested that it was committed in Idaho, because Zadra's check did not become a thing of value until it was endorsed, which endorsement was made in the first instance in the latter state. We are compelled to disagree with this viewpoint as to the effect of such endorsement; it is contrary to the principle announced in *Miller v. People,* 72 Colo. 375, 211 Pac. 380. In that case we quoted from *State v. Thatcher,* 35 N. J. Law, 445, on the subject of a chose in action as follows: " 'Was it a thing of any value? While it remained locked up in his [the maker's] secretary, it was of no value to the maker, but *eo instanti* it passed out of his hands by the fraud, it became impressed with the qualities of commercial paper, and possessed to him the value which it might cost to redeem it from a *bona fide* holder.' "

In *Knepper v. People,* 63 Colo. 396, 403, 167 Pac. 781, we said: "The statute does not specifically require that any of these enumerated classes of personal property shall have value in the hands of the person swindled. If the instant they are reduced to possession by the swin-

dler they have value, that meets the requirements of the statute.'' The Knepper case is followed in *Miller v. People, supra.*

6. The value of Zadra's check was demonstrated, but not created, by its endorsement and payment; if it had possessed no inherent value beyond its mere endorsements, certainly the drawee bank at Glenwood Springs would have repudiated it and returned it marked ''No funds,'' regardless of any endorsement. If the check was as destitute of value when originally issued as defendant would have us believe, it seems remarkable that defendant was so keen to get it away from the maker. The argument would seem to have as little merit as if it were contended that negotiable securities are not valuable until reduced to United States currency, or even that gold coin is not valuable until it is spent.

7. The fact that the several receiving banks through whose hands the check passed, stamped it, ''Prior endorsements guaranteed,'' is argued by defendant's counsel in its bearing on the question of when and where title passed. The banks of course were all innocent, but as to defendant, no honestly obtained title to the check ever did pass from the prosecuting witness. Such as it was, however, it passed at Glenwood Springs when the check was mailed from there. The check was cleared without any dispute or delay, but even if the maker had stopped payment, the rights of such maker and the endorsers or banking institutions inter sese is wholly outside the issues. Numerous civil cases involving the law of bank checks are cited, but they are without present bearing. Our splendid negotiable instruments act is an outgrowth of the law merchant, and is based upon the experiences of traders and merchants from time immemorial. Such legislation was not designed as an instrument of fraud, and we believe the rule here adopted is consistent with reason and justice.

8. The question of a supposed conflict of jurisdiction as applied to different states in a case of this kind is

one of first impression with us, and merits a further brief discussion. We are not dismayed at the conflict of authorities on the question of where a crime was committed; there is a manifest inconsistency in some of their reasoning and a departure from the rules of logic in differentiations of various kinds of crimes.

 The principle that the courts of the state where the crime is committed have jurisdiction is further explained in Minor on Conflict of Laws, page 498, section 203, where it is said: ''This is based upon the idea that the crime is an offense against the sovereignty and good order of the state within whose jurisdiction it occurs, and that each state must attend to the vindication of its own sovereignty.'' When defendant feloniously by fraudulent pretenses extracted $5,000 of Zadra's money out of the bank at Glenwood Springs, we are persuaded that the crime was committed in Colorado fully as much as if defendant had robbed Zadra or the bank with far reaching tools while he stood in an adjoining state. One may perpetrate an offense against a state or county upon whose soil he never touched foot. Bishop's New Criminal Procedure (2d Ed.), vol. 1, page 28, section 53. We see no difference in principle from the case at bar if one should stand in one state and shoot at another in a neighboring state. ''The assailant is presumed to follow up his bullet, and constructively makes the attempt to kill in the state where the bullet strikes.'' Minor on Conflict of Laws, page 501, section 204. Here, defendant's bullets of fraudulent misrepresentations were shot from Idaho, some of them, in fact, from Colorado, but they all struck the mortal blow to Zadra's bank account in Colorado, where the missiles took effect. We are unable to see any valid distinction on the subject of venue in the absence of statute, between such offenses against the person and against property, when both constitute crimes against the state. If counsel for defendant are correct in their argument, it logically follows that it is no crime in this state to abstract a billfold of traveler's checks from a

bank in this jurisdiction by fraud or theft, as long as the miscreant takes the precaution to cash them in any other part of the world. It cannot be so.

9. *Burton v. United States,* 196 U. S. 283, 25 Sup. Ct. 243, 49 L. Ed. 482 is cited. That case involved a crime against the United States, but Updike's crime was against this state, cognizable under its laws. In the Burton case, the decision that the senator could not be tried in Missouri for violating section 1782, U. S. Revised Statutes, did not preclude his being tried therefor in the District of Columbia, both of such territories being under the jurisdiction of the federal government. But if the defendant Updike cannot be tried in Colorado for violating section 6930, C. L. 1921, he cannot be tried anywhere for it. We may safely assume that our sister state of Idaho has a statute making it a crime to obtain money by false pretense, but it is idle to speculate whether a statute of that state would cover a case of this kind, or whether the courts there would hold that they have jurisdiction. The courts of that commonwealth may decide otherwise, as they have a perfect right to do, and the defendant would thereby wholly escape punishment for his fraudulent conduct. There is no rivalry between the states of Idaho and Colorado as to which shall enforce its own laws; each is supreme in its own jurisdiction, and no constitutional question is presented either in the motion for new trial or by assignment of error. All that we can say is that a crime was or was not committed in this state. It is not as if the venue had been improperly laid in one county, but the case could be tried in another. In effect, the plea to the jurisdiction here amounts to a complete plea in bar, as far as the courts of this state are concerned.

10. We do not yield to anyone in our respect for our highest tribunal, but that court itself does not exact of us a slavish adherence to its construction of a federal statute nor as to where a case shall be tried, when the question presented is under a state statute, not in

contravention of the laws of the United States. Other state courts have not hesitated to exercise independence of thought, as we also have done. Indeed, our highest tribunal has encouraged it; it has been pleased to say that it reads a state statute in the light of the construction placed upon it by the state court. *Bandini Petroleum Co. v. Superior Court, Los Angeles County,* 284 U. S. 8, 52 Sup. Ct. 103, 76 L. Ed. 136, 78 A. L. R. 826; *Lindsley v. Natural Carbonic Co.,* 220 U. S. 61, 73, 31 Sup. Ct. 337, 55 L. Ed. 369, 375, Ann. Cas. 1912C, 160.

11. The above disposes of defendant's main contention. The record contains 3,451 folios and there are 89 assignments of error, covering the subjects of the information, evidence and instructions, all of which we have fully considered. The information stated the offense "with great particularity, and in terms so plain that the nature of the offense may be easily understood, not only by the defendant, but also by the jury. That is sufficient. C. L. §7062; *Sarno v. People,* 74 Colo. 528, 223 Pac. 41." *Cliff v. People,* 84 Colo. 254, 258, 269 Pac. 907. The proof was ample to sustain the verdict; there was no error in the admission or rejection of evidence, nor in the giving or refusal of instructions. Some of the instructions refused contain inaccurate statements of the law; others that were refused are sufficiently covered by those that were given, and others relate to matters hereinabove discussed at length. We find no reversible error in the record.

Judgment affirmed.

MR. JUSTICE BUTLER, MR. JUSTICE CAMPBELL and MR. JUSTICE HILLIARD dissent.

MR. JUSTICE BUTLER, dissenting.

The views expressed in the majority opinion seem to me to be so at variance with sound legal principles, that I am forced to dissent.

Zadra, in Glenwood Springs, mailed his check to Updike, who received it at Boise, Idaho. The check was drawn upon the First National Bank of Glenwood Springs, and was payable to the order of Updike. The check bears the endorsements of Updike, the Updike Sheep Co., the First National Bank of Idaho, Boise, Idaho, the Colorado National Bank and the Denver branch of the Federal Reserve Bank of Kansas City. The endorsement of each of the three banks contained a guaranty of prior endorsements. The check was paid to the Federal Reserve Bank by the drawee bank at Glenwood Springs.

The trial court had no jurisdiction, because the crime charged and of which Updike was convicted was not committed in Colorado. The crime of obtaining property by false pretenses is committed where the property is obtained by the defendant. *Pepper v. People,* 75 Colo. 348, 225 Pac. 846; 11 R. C. L. p. 854. The charge in the present case is obtaining money by false pretenses, and Updike was convicted of obtaining money by that means. The jurisdiction of the trial court, therefore, depends upon whether or not the *money* was obtained by Updike in Glenwood Springs. If it was not obtained there by Updike, the court was without jurisdiction. Of course, payment to an agent is payment to the principal. As it is undisputed that Updike did not personally receive the money in Glenwood Springs, the question is narrowed to this: Was, or was not, the bank to whom the drawee bank paid the money in Glenwood Springs the agent of Updike?

Not one of the endorsements on the check was, in terms, "for collection;" each was a general, not a restrictive, endorsement. Section 3853, Compiled Laws, provides: "An indorsement is restrictive, which either: First—Prohibits the further negotiation of the instrument; or Second—Constitutes the indorsee the agent of the indorser; or Third—Vests the title in the indorsee in trust for or to the use of some other person." In *Federal Reserve*

*Bank v. First National Bank,* 87 Colo. 158, 286 Pac. 116, we held that, in the absence of special agreement, when a paper is endorsed without restriction by a depositor and at once passed to his credit by the bank to which he delivers it, he becomes the creditor of the bank and the latter becomes the owner of the paper, and in making collection is not the agent of the depositor; but whether such a transaction constitutes a sale or a mere deposit for collection depends upon the attending circumstances. In *Scully v. Denver National Bank,* 76 Colo. 227, 230 Pac. 610, we held that a check deposited with a bank and credited to the account of the depositor, upon which he drew from time to time, was a sale and not a deposit for collection. In *Bromfield v. Cochran,* 86 Colo. 486, 283 Pac. 45, we held that when a bank credits to the account of the payee the amount of a check deposited by him, and permits him to draw thereon, it thereby elects not to exercise the right to decline payment until collection, and becomes the owner of the check. To the same effect, see: *Union National Bank v. Maines-Hough Motor Co.,* 70 Colo. 132, 197 Pac. 753; *Manatee County State Bank v. Bruen-Fisher Fruit Co.,* 70 Colo. 342, 201 Pac. 560; *City of Douglas v. Federal Reserve Bank,* 271 U. S. 489, 46 Sup. Ct. 554, explained in *Federal Reserve Bank v. First National Bank, supra.* The law announced in those cases is the law as it is stated in *Burton v. United States,* 196 U. S. 283, 25 Sup. Ct. 243. In that case a senator of the United States was charged with and convicted of having rendered services for a certain corporation before the post office department, in matters in which the United States was interested, and with having received payment therefor in St. Louis, Missouri. The case was brought and prosecuted in the federal district court for the eastern district of Missouri. The defendant claimed that the crime, if any, was not committed in Missouri, and, therefore, that the trial court was without jurisdiction. There, as here, the question was, Where did the *defendant* receive the *money?* The undisputed evidence was to the

effect that the corporation sent from St. Louis to the defendant in Washington its check drawn on a trust company in St. Louis; that the defendant deposited the check in his bank in Washington, receiving credit therefor at once; that the check was subsequently paid by the drawee trust company in St. Louis. The cashier of the Washington bank testified that the defendant had the right, immediately after the credit was made, to draw out the whole, or any portion thereof, without waiting for the payment of the check at St. Louis, and that there was a custom, when a check was not paid, to charge it up against the customer's account. In that case, as in this, the trial court submitted to the jury the question as to where the payment was made to the defendant. The Supreme Court held that, as a matter of law, the money was not received by the defendant at St. Louis; that if any crime was committed, it was not committed in St. Louis; and that the trial court, therefore, was without jurisdiction. The court said, among other things: "There was no oral or special agreement made between the defendant and the bank at the time when any one of the checks was deposited and credit given for the amount thereof. The defendant had an account with the bank, took each check when it arrived, went to the bank, indorsed the check which was payable to his order, and the bank took the check, placed the amount thereof to the credit of the defendant's account, and nothing further was said in regard to the matter. In other words, it was the ordinary case of the transfer or sale of the check by the defendant and the purchase of it by the bank, and upon its delivery to the bank, under the circumstances stated, the title to the check passed to the bank and it became the owner thereof. It was in no sense the agent of the defendant for the purpose of collecting the amount of the check from the trust company upon which it was drawn. * * * The testimony of Mr. Brice, the cashier of the Riggs National Bank, as to the custom of the bank when a check was not paid, of charging it up against the depositor's

account, did not in the least vary the legal effect of the transaction; it was simply a method pursued by the bank of exacting payment from the indorser of the check, and nothing more. There was nothing whatever in the evidence showing any agreement or understanding as to the effect of the transaction between the parties—the defendant and the bank—making it other than such as the law would imply from the facts already stated. * * * A careful scrutiny of the evidence with relation to this charge to the jury shows that there was no foundation for submitting to the jury the question of what was the understanding (other than such as arose from the transaction itself, as shown by uncontradicted evidence) between the defendant and the bank at the time when these various checks were deposited with the bank and their proceeds placed to the credit of the defendant. There was no agreement or understanding of any kind other than such as the law makes from the transaction detailed, which was itself proved by uncontradicted evidence offered by the Government itself. In the absence of any special agreement that the effect of the transaction shall be otherwise (and none can be asserted here), there is no doubt that its legal effect is a change of ownership of the paper, and that the subsequent action of the bank in taking steps to obtain payment for itself of the paper which it had purchased can in no sense be said to be the action of an agent for its principal, but the act of an owner in regard to its own property.''

The rule announced by us in *Federal Reserve Bank v. First National Bank, supra,* is substantially the rule announced in *Burton v. United States, supra.* If there are any authorities to the contrary, they were not called to the court's attention, nor do they appear in the majority opinion. On this point, the only case cited by counsel for the people is *Pepper v. People,* 75 Colo. 348, 225 Pac. 846. That case does not support the position taken by the people. There, according to the record, the undisputed evidence showed clearly that the draft, drawn by

Pepper in Westcliffe on the complaining witness in Denver, was left by Pepper with a bank in Westcliffe for collection, was forwarded to a Denver bank for collection, and was there paid by the complaining witness. We held that in such circumstances the payment to the Denver bank was payment to Pepper's agent, and therefore that the crime of obtaining the *money* by false pretenses was committed, not in Custer county, from which the draft was sent, but in Denver. That holding is strictly in harmony with the Burton decision, supra; indeed, it applied the very principle announced in that case. Had the check in the Burton case been sent to St. Louis for collection, the decision would have been the same as in the Pepper case.

Bearing in mind that, as we said in *Federal Reserve Bank v. First National Bank, supra,* whether a transaction constitutes a sale or a mere deposit for collection depends upon surrounding circumstances, it is important that the surrounding circumstances be fully disclosed, and that no material evidence thereof be excluded. But, as we shall see, material evidence offered by the defendant was rejected by the court. When Updike was on the witness stand, his counsel asked him the following questions: "State whether or not, Mr. Updike, that check was given to the cashier of the First National Bank of Idaho, Boise, Idaho, for immediate deposit and credit to your account or for collection." "State whether or not anything was said to you by the cashier of the bank at that time as to the deposit of that particular check." The court sustained an objection to each question. Thereupon Updike's counsel made a formal offer of evidence to the effect that upon receipt of the check, Updike deposited it, endorsed in blank, with the bank in Boise for immediate credit in order that his company might at once purchase lambs; that the check was accepted by the bank as cash and not for collection; that it was forthwith credited to the account of his company; that the company and Updike, as an officer thereof, were given the privilege of im-

mediately checking upon said account and withdrawing the funds represented thereby; and that there were no conditions, restrictions, or agreements "attached to or made or entering into the deposit of said check." Under our decision in *Federal Reserve Bank v. First National Bank, supra,* and under the decision of the Supreme Court of the United States in the Burton case, supra, that evidence was admissible. In sustaining the objections thereto, the court erred.

The witness McCarthy, president of the Glenwood Springs National Bank, produced in court the remittance sheet used by the Denver branch of the Federal Reserve Bank of Kansas City in transmitting the check. Counsel for Updike offered to prove by another witness, Mr. Driscoll, whose qualifications as an expert on banking matters were not challenged, that the rules, regulations, customs and usages of Federal Reserve Banks and their branches in handling for collection, payment and credit items transmitted by other banks are uniform throughout the entire United States as respects all Federal Reserve Banks; that all such Federal Reserve Banks and their branches use the same general and substantial form of remittance letters in transmitting such checks, drafts and other items to the drawee banks; that the form of remittance sheet used by the Denver branch of the Federal Reserve Bank in transmitting the check in question showed that it was deposited in the bank of original deposit for immediate credit; that forwarding the item was done by the bank of original deposit as the owner of the item, and not as the agent of the depositor for collection only; and that the Federal Reserve Bank uses an entirely different form of remittance letter in transmitting items for collection only, where the original deposit had been for collection and where no immediate credit had been given to the account of the depositor. In sustaining the objection to the offer of such evidence and in sustaining the objection to the admission of the remittance sheet, the court erred.

This is not a case of variance, as in the majority opinion it is assumed to be. The three cases cited in paragraph 1 of that opinion have no application to the situation disclosed by the record in the present case. *Arnett v. People,* 91 Colo. 56, 11 P. (2d) 806, is wholly unlike the case at bar. There, according to the record, the charge was that the defendants obtained from W. F. Cross, in the county of Routt, in the state of Colorado, $409 in *money.* The proof was that they did obtain the *money* in that county and state, and the defendants were convicted of having done so. They obtained the money by cashing Cross's check in Routt county. As they obtained, in that county and state, the money that they were charged with having obtained there, we held that the fact that they used a check as a means of obtaining the money did not relieve them from the charge. Indeed, the transaction was the same, in effect, as though A had handed to B a written slip. ordering the cashier in his store in that county to pay money to B, and the cashier had paid it to B personally, as ordered. If Arnett and his codefendants, though they received the check, had not obtained the *money,* they could not have been convicted, under the information filed, of having obtained the *check.* This shows that, for the purposes of such a case as the one at bar, the distinction between a check and money is a substantial one, just as the Supreme Court of the United States, in the Burton case, supra, held it to be. In the case at bar, Updike was charged with having obtained *money* by false pretenses, and was convicted of having so obtained the *money*; and yet, when it appears that the crime of obtaining the money was not committed in this state, the court holds that we may ignore the charge actually made and the verdict actually rendered, and affirm the conviction; that, although Updike did not receive the money in this state, he did receive a check here; that the distinction between a check and money is not a substantial one; and that to hold, as the Supreme Court of the United States held in the Burton case, supra, that

in such a case as this there is a substantial difference between a, check and money is "ridiculous." In *Roll v. People,* 78 Colo. 589, 243 Pac. 641, the defendant was charged with having obtained a *check* (not money) by means of a confidence game, and was convicted of having obtained the *check* (not money) by that means. In the present case, both the charge and the conviction concerned money, and yet the court upholds the conviction, although the money was not obtained by the defendant in this state. The case of *Briggs v. People,* 76 Colo. 591, 233 Pac. 836, sheds no light whatever upon the question that we are considering. Language used in an opinion must be considered in connection with the facts and issues in the case decided. *American Mortgage Co. v. Logan,* 90 Colo. 157, 7 P. (2d) 953. The language quoted in the majority opinion in the present case was used concerning a situation wholly unlike that existing in this case. Briggs was convicted of misapplying a check, the proceeds of a sale by him of stock that he had converted. Discussing that situation, we said: "The instant he sold the stock the bank owned the proceeds; whether check, cash or draft is wholly immaterial. Defendant was then a mere agent to receive and pay over. * * * When he deposited the check to his personal credit he transferred it from the possession of the bank, through himself as president, to the possession of Briggs individually. In other words he put the bank's money in his pocket and spent it."

In the majority opinion, it is said: "If the defendant Updike cannot be tried in Colorado for violating section 6930, C. L. 1921, he cannot be tried anywhere for it." The assumption that he cannot be tried in Colorado for violating that section is baseless. Under that section a prosecution will lie for obtaining a check by false pretenses. *Stoltz v. People,* 59 Colo. 342, 148 Pac. 865; *Whitfield v. People,* 79 Colo. 108, 244 Pac. 470; *Miller v. People,* 72 Colo. 375, 211 Pac. 380. Zadra mailed his check in Glenwood Springs; and, in the circumstances disclosed

by the record, the post office there was the agent of Updike for the purpose of receiving and forwarding the check. Therefore, the mailing of the check was a delivery of the check to Updike at Glenwood Springs, 11 R. C. L. pp. 854, 855; 16 C. J. p. 191; Restatement of the Law of Contracts, §§64, 66; 6 R. C. L. pp. 611, 612. If Updike had been charged, as he should have been, with having obtained the check by false pretenses, he would have been charged with a crime committed within the jurisdiction of the trial court.

The question here, as in the Burton case, supra, is whether or not the crime charged, and of which there was a conviction, was committed within the territorial jurisdiction of the court that tried the case. I submit that that question should be answered here, as it was answered in the Burton case, supra, in the negative. The judgment, in my opinion, should be reversed.

For the reasons stated, I respectfully dissent from the opinion and the judgment of the court.

MR. JUSTICE CAMPBELL and MR. JUSTICE HILLIARD concur in this dissenting opinion.