Commonwealth *v.* Thomas, Appellant.

Argued November 14, 1962. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and KEIM, JJ.

*Joseph N. Bongiovanni, Jr.,* with him *Frederick F. Blumberg,* for appellant.

*Burton Satzberg,* Assistant District Attorney, with him *Arlen Specter,* Assistant District Attorney, *F. Emmett Fitzpatrick, Jr.,* First Assistant District Attorney, and *James C. Crumlish, Jr.,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, March 19, 1963:

The factual background of the homicide which resulted in the conviction of Robert W. Thomas of murder in the first degree with the penalty fixed at life imprisonment is set forth at length in *Commonwealth v. Wilson,* 394 Pa. 588, 148 A. 2d 234, *Commonwealth v. DeMoss,* 401 Pa. 395, 165 A. 2d 14 and *Commonwealth v. Ellsworth,* 409 Pa. 505, 187 A. 2d 640. Except as relevant and pertinent to the issues raised on this appeal, such background need not be herein recited.

The theory of the Commonwealth was that Thomas, a deputy sheriff of Dade County, Miami, Florida, became acquainted with Mrs. Lulubel Rossman (the deceased) when she enlisted the aid of Thomas' fellow deputy to check on the activities of a man with whom

she thought herself to be amorously involved. Through such acquaintanceship, Thomas learned that deceased was in the habit of having large sums of money on her person and in her living quarters. The Commonwealth sought to prove that Thomas conceived the idea of robbing the deceased and to that end, through numerous telephone calls between Florida and Oklahoma and personal meetings in Florida and Oklahoma, formed a conspiracy with Gus DeMoss, Raymond Wilson and Frank Ellsworth;[1] in furtherance of that conspiracy, Wilson and Ellsworth went to Philadelphia and, on July 3, 1955, entered the deceased's room in the Adelphia Hotel where they robbed her of a large sum of money; in the course of that robbery, the deceased met her death.[2] There is no doubt that the plan and all the details of the conspiracy, insofar as Thomas is involved, were formulated *outside* Pennsylvania, that only Wilson and Ellsworth were in Pennsylvania when the felony murder took place and that Thomas was never in Pennsylvania until he surrendered for trial.

Thomas was indicted on the charges of conspiracy and murder. After a trial in the Courts of Oyer and Terminer and Quarter Sessions of Philadelphia County before a court and jury, Thomas was found guilty both of conspiracy and of murder in the first degree with the penalty fixed at life imprisonment. A nolle pros was entered on the conspiracy charge and Thomas was sentenced on the murder charge. From the judgment of sentence Thomas has taken this appeal.

Thomas' contentions are three-fold: (a) since the proof of the Commonwealth is that the conspiracy be-

---

[1] At one time, Thomas and DeMoss had been fellow police officers in Tulsa, Oklahoma, and, in the course of their police work, had on one occasion arrested Wilson and Ellsworth.

[2] The proof of the formation of this conspiracy and Thomas' role in such conspiracy, although based on circumstantial evidence, was overwhelming.

tween Thomas, DeMoss, Wilson and Ellsworth which resulted in the felony murder was formed and plotted entirely *outside* Pennsylvania and since Thomas had never been *within* Pennsylvania, the Pennsylvania courts lacked jurisdiction to try him for murder even though the felony murder had taken place in Pennsylvania; (b) the testimony of certain witnesses was improperly received in evidence; (c) the charge of the trial court placed undue emphasis upon the Commonwealth's testimony, misquoted certain evidence and permitted the jury to speculate.

In respect to the first contention, it is argued that the Pennsylvania courts lacked extra-territorial jurisdiction to try him for a crime which took place in Pennsylvania from which state he was physically absent, at the time.[3] Since there is no statute which gives such jurisdiction, jurisdiction, if it does exist, must arise from the common law.

It is well settled that *within* the Commonwealth ". . . prosecution for criminal conspiracy may be brought in the county where the unlawful combination or confederation was formed, *or* in any county where an overt act was committed by any of the conspirators in furtherance of that unlawful combination or confederacy": *Commonwealth v. Mezick*, 147 Pa. Superior Ct. 410, 413, 24 A. 2d 762; *Commonwealth v. Bartilson*, 85 Pa. 482, 489; *Commonwealth v. Barnes*, 107 Pa.

---

[3] Thomas correctly contends that his voluntary surrender to the Pennsylvania authorities did not cure the lack of jurisdiction to try him for the crime: *Mills v. Commonwealth*, 13 Pa. 627, 630; *Lavery v. Commonwealth*, 101 Pa. 560, 565; *Commonwealth ex rel. v. Francies*, 250 Pa. 496, 502, 95 A. 527; *Commonwealth ex rel. Paylor v. Cavell*, 185 Pa. Superior Ct. 176, 185, 138 A. 2d 246. In *Mills*, supra (p. 630), the Court said: "But it is not the consent of counsel which can constitute a tribunal by which a citizen may be tried and punished. It is the law of the land, and that alone, which can constitute and establish such a tribunal."

Superior Ct. 46, 59, 162 A. 670; *Commonwealth v. Spencer,* 6 Pa. Superior Ct. 256, 268-9.

Does the same rule apply where a conspiracy is formed *without* the Commonwealth and an overt act in furtherance of that conspiracy takes place *within* the Commonwealth? In resolving this question, we first must examine the legal responsibility which the law attaches to one who enters into a criminal conspiracy. Where the existence of a conspiracy is established, the law imposes upon a conspirator full responsibility for the natural and probable consequences of acts committed by his fellow conspirator or conspirators if such acts are done in pursuance of the common design or purpose of the conspiracy. Such responsibility attaches even though such conspirator was not physically present when the acts were committed by his fellow conspirator or conspirators and extends even to a homicide which is a contingency of the natural and probable execution of the conspiracy, even though such homicide is not specifically contemplated by the parties (*Commonwealth v. Spardute,* 278 Pa. 37, 50, 122 A. 161).

In *Commonwealth v. Burdell,* 380 Pa. 43, 49, 110 A. 2d 193, this Court said: "It is hornbook law that a conspirator is criminally responsible for the acts of his co-conspirators which are committed in furtherance of the common design even though he was not present when the acts were committed: Commonwealth v. Strantz, 328 Pa. 33, 40, 195 A. 75, 79; 15 C.J.S. 1105, §74. It was said by Chief Justice GIBSON in Rogers v. Hall, 4 Watts 359, 361, that 'the least degree of concert or collusion between parties to an illegal transaction makes the act of one the act of all.' " In *Commonwealth v. Doris,* 287 Pa. 547, 550, 135 A. 313, we said: "There can be no question of the legal responsibility of the accomplice for the act committed by his co-conspirators while the crime agreed upon is in the

course of perpetration, for he is criminally liable for the natural consequences of the acts of his fellows under such circumstances. Where the parties by their conduct show the intention to use such force as is necessary to accomplish their purpose and, in furtherance of the common design another is killed, each is guilty of the crime. [citing cases]". See also: *Collins v. Commonwealth*, 3 S. & R. 220; *Commonwealth v. Spardute*, supra; *Commonwealth v. Lowry*, 374 Pa. 594, 600, 98 A. 2d 733; *Commonwealth v. Rhey*, 140 Pa. Superior Ct. 340, 350, 351, 14 A. 192; *Commonwealth v. Jackson*, 187 Pa. Superior Ct. 2, 144 A. 2d 249; *Commonwealth, v. Whalen (No. 1)*, 189 Pa. Superior Ct. 351, 356, 357, 150 A. 2d 133.

The determination of jurisdiction over Thomas in the case at bar must rest upon this theory of vicarious criminal responsibility which arises out of the existence of the conspiracy. The conspiracy in which Thomas took part had as its goal and objective the robbery of the deceased, a robbery which was to take place in Pennsylvania wherein the deceased was a resident; as a conspirator, Thomas became criminally responsible for the acts of his fellow conspirators, Wilson and Ellsworth, which acts were committed in Pennsylvania, and such responsibility included not only the robbery—the objective of the conspiracy—but also the homicide which was a contingency of the natural and probable consequences of the robbery. Such criminal responsibility attached to Thomas even though he was not physically present in Pennsylvania when the robbery and homicide occurred; in the eyes of the law, Thomas, as a conspirator, was constructively present when the robbery and the homicide occurred.

In *Commonwealth v. Gillespie*, 7 S. & R. 469, the defendant had conspired with another person in New York to sell lottery tickets in Pennsylvania, wherein such sales were illegal, and the defendant, who had

not been in Pennsylvania, supervised the sale of the lottery tickets in Pennsylvania and the question arose as to whether Pennsylvania had jurisdiction to try the defendant. This Court said: ". . . if the parties are linked in one community of design, and of interest, there can be no good reason, why both may not be tried where one distinct overt act is committed. For he who procures another to commit a misdemeanor, is guilty of the fact, in whatever place it is committed by the procuree." (p. 478). Very recently, the Superior Court in *Commonwealth v. Prep*, 186 Pa. Superior Ct. 442, 451, 142 A. 2d 460, stated: "It is a well established theory of the law that, where one puts in force an agency for the commission of crime, he, in legal contemplation, accompanies the same to the point where it becomes effectual; consequently, in many circumstances one may become liable to punishment in a particular jurisdiction while his personal presence is elsewhere, and in this way he may even commit an offense against a state or county *upon whose soil he has never set his foot*." (Emphasis supplied).

Other jurisdictions recognize the existence of such jurisdiction. In *United States v. Johnston*, 227 F. 2d 745, 747, the Court of Appeals for the Third Circuit, speaking through Judge GOODRICH, said: "It is well established that one does not have to be physically present in a state to be guilty of a criminal offense there. The standard illustration, familiar to every law student, is that of shooting across a state boundary line and hitting a victim in the second state. The offense is complete where the fatal force hits the victim and the defendant may be prosecuted for homicide there if jurisdiction can be obtained over his person." The United States Supreme Court in *Strassheim v. Daily*, 221 U.S. 280, 285, 31 S. Ct. 558, said: "Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a

State in punishing the cause of the harm as if he had been present at the effect, if the State should succeed in getting him within its power." See also: *Ford v. U.S.,* 273 U.S. 593, 47 S. Ct. 531; *Lamar v. U.S.,* 240 U.S. 60, 36 S. Ct. 255; *Williams v. U.S.,* 215 F. 2d 35; *U.S. v. Steinberg,* 62 F. 2d 77; *U.S. v. Davis,* No. 14932, 25 Fed. Cas. 786; *Updike v. People,* 92 Colo. 125, 18 P. 2d 472; *Simpson v. State,* 92 Ga. 41, 17 S.E. 984; *Commonwealth v. Smith,* 11 Allen (Mass.) 243; *State v. Vetrano,* 121 Me. 368, 117 A. 460; *State v. Hall,* 114 N.C. 909, 19 S.E. 602; 22 C.J.S., Criminal Law, §134, p. 357; Minor, Conflict of Laws, §203, p. 498. While many of these cases involve false pretenses, larceny or other crimes less serious than murder, the application of the theory upon which jurisdiction vests does not depend upon the gravity of the offense charged.

When this conspiracy was formed its purpose was to effect a robbery in Pennsylvania. The proof of the Commonwealth clearly reveals that in this conspiracy Thomas played a principal role and the act of robbery committed by Wilson and Ellsworth in Pennsylvania, in the course of which deceased met her death, was a natural and probable consequence of the conspiracy. For the acts committed by his co-conspirators Thomas is legally liable and, even though not present when the contemplated acts took place, Thomas must assume the responsibility for the consequences of the conspiracy and the acts of his co-conspirators. In our view, the courts of Pennsylvania, where the conspiracy took effect, clearly had jurisdiction to try Thomas.

Thomas' second contention is that the trial court erred in admitting into evidence the testimony of five Commonwealth witnesses: (a) Margaret M. Smith, an Adelphia Hotel chambermaid, testified that on Friday, July 3, 1955—two days prior to the homicide—, as she entered deceased's room in the course of her duties, deceased was speaking on the telephone in a very excited

manner and, shortly thereafter, deceased told Miss Smith she had been trying to contact a "Sheriff in Miami"; (b) Edwin Thomas, a taxi driver requested by deceased to drive her to Florida, testified that en route to Washington, D.C. from Philadelphia, deceased told him she intended to settle in Florida and that "she had some business that she wanted to get off her mind with Sheriff Thomas"; (c) James Jerdon, a chauffeur for a Philadelphia livery-hire firm, was requested by deceased to drive her to Virginia on Wednesday, July 6, 1955, that she telephoned him on Sunday, July 3—the day of the homicide—and cancelled the trip, stating: " 'We won't be able to go Wednesday. I was just talking to my Deputy Sheriff. We will have to go Thursday' "; (d) Albert Schuckerp, an Adelphia Hotel bellman, testified that he accompanied deceased to a Western Union office in Philadelphia on Friday, July 1,—two days before the homicide—where she directed Schuckerp to fill out a money order blank to be made payable to Robert Thomas and sent to the Dade County Sheriff's office, that the money order blank required the insertion of the sender's name but the deceased refused to sign her name thereto and, when Schuckerp questioned her refusal to sign, the deceased said: ". . . that Mr. Thomas . . . didn't want her name on the telegram"; (e) Adeline Walker, a personal friend of the deceased, testified that she and the deceased had planned to take a trip to Connecticut on Tuesday, July 5; that deceased called her on Sunday, July 3—the day of the homicide —and postponed the trip stating: ". . . she had sent Mr. Thomas a money order for $250 and they were up in an airplane going after Ridgeway [the object of deceased's amorous pursuit] with tommy guns" and "that they feared for her safety, that they were going to send a bonded chauffeur to move her to another downtown hotel, that she wasn't to tell anyone or let anyone in her room or tell anyone where she was going, but she

said she would call me as soon as she had gotten into this other hotel."

In *Commonwealth v. Wilson,* supra, pp. 599-601, we discussed similar testimony given by Mrs. Walker in that trial; "Mrs. Walker's testimony, if believed, was indicative of an intent on the part of [the deceased] to stay in her room until a 'bonded chauffeur' arrived and the fact is that she met her death in that room nine to ten hours later. Regardless of whether [the deceased] was acting rationally or irrationally in arriving at this expressed intent and regardless of whether her story about a call from Thomas was real or fancied, nevertheless her statements to Mrs. Walker evidenced her then existing intention." We admitted such testimony on the ground that the declarations of the deceased indicated an existing intent or state of mind of the deceased-declarant and, since such declarations were made in a "natural manner" and were material and relevant, their admission could be justified as an exception to the hearsay rule. That Thomas, not Wilson, is the defendant does not affect the admissibility of such evidence. In our view, the court properly admitted Mrs. Walker's testimony.

The testimony of Margaret Smith, Edwin Thomas, James Jerdon and Albert Schuckerp stands on slightly different footing. While, in our view, the admission of their testimony into evidence could be justified (*Commonwealth v. Marshall,* 287 Pa. 512, 135 A. 301; *Ickes v. Ickes,* 237 Pa. 582, 85 A. 885; *Nuttall v. Reading Co.,* 235 F. 2d 546), yet, even if such testimony should not have been admitted, its reception into evidence was clearly harmless error. If we view this testimony in the light *most unfavorable* to Thomas, such testimony, if believed, would point to a relationship between Thomas and the deceased. That such relationship *did exist* was shown by *other* evidence—the admissibility of which is not questioned—presented by the Common-

wealth. Thus, the admission of such evidence did no harm to Thomas and an examination of the instant record in its entirety fully confirms the fact that the admission of the testimony of these witnesses, even if erroneous, did not prejudice Thomas.

Lastly, Thomas alleges that the trial court, in its charge, unduly stressed the Commonwealth's evidence and made only slight reference to the defense evidence. More specifically, Thomas urges that the trial court did not treat in depth the evidence contradicting the identity of Thomas, misquoted the evidence and permitted the jury to speculate as to Thomas' guilt or innocence. An examination of the record and the charge of the court in its entirety indicates clearly that this contention is without basis in fact. The trial court, in every respect, fairly, logically and in depth instructed the jury upon the applicable law, carefully and adequately reviewed the testimony both of the defense as well as the Commonwealth, and properly placed the determination of Thomas' guilt or innocence in the hands of the jury.

The second and third contentions of Thomas fall squarely within the statement of the late Chief Justice MAXEY in *Commonwealth v. Barnak*, 357 Pa. 391, 419, 54 A. 2d 865: "Taking an appeal in criminal cases is not a game in which the appellant wins if he can show that the trial judge fell a few degrees short of perfection in the conduct of his trial. This court has consistently refused to reverse convictions of murder in the first degree, even with the death penalty imposed, for errors in the conduct of the trial or in the admission of evidence or in the judge's charge, when these errors did not deprive the defendant of the fundamentals of a fair trial."

That which this Court said in *Wilson*, supra, p. 609, can well be paraphrased in the case at bar: "Our review of the record convinces us that [Thomas] had a

fair and impartial trial, that all his rights were zealously protected and that the Commonwealth's evidence, though circumstantial in nature, proved beyond a reasonable doubt [Thomas'] guilt."

Judgment of sentence affirmed.